In re OLYMPIA HOLDING
CORPORATION, et al.,
Debtors.

Lloyd T. WHITAKER, as Trustee
of the Estate of Olympia Holding
Corporation, Debtor, Plaintiff,

v.

FRITO–LAY INCORPORATED,
a Delaware corporation,
Defendant.

In re P*I*E UNDERCHARGE
LITIGATION.

Nos. 92–825–Civ–J–16, 93–1–MV–J–16.

United States District Court,
M.D. Florida,
Jacksonville Division.

Sept. 13, 1993.

Order Denying Reconsideration
Oct. 28, 1993.

George E. Ridge, Leslie Goller Dillingham, Kent, Ridge & Crawford, Mitchell Wooten Legler, Steven Arthur Werber, Gardner F. Davis, Foley & Lardner, W. Kelsea Wilber, Law Office of W. Kelsea Wilber, Jennifer C. Pinson–Harvey, Phoenix Advisors & Collections, Inc., Steven R. Browning, Robert M. Poppell, c/o The Estate of P.I.E., Jacksonville, FL, for plaintiff.

John A. Tucker, Caven, Clark & Ray, P.A., Jacksonville, FL, Robert L. Cope, Grove, Jaskiewicz & Cobert, Washington, DC, for defendant.

## ORDER

JOHN H. MOORE, II, Chief Judge.

This cause is before the Court on Defendant's Motion for Judgment on the Pleadings (docket no. 7). Plaintiff has filed a timely response (docket no. 13). This Court also has additional arguments in support of Defendant's motion filed in accordance with this Court's Case Management Order of February 12, 1993, by similarly situated defendants. The pleadings of parties not involved in the above captioned case can be found in the Master Case file, Case No. 93–1–MV–J–16.

### BACKGROUND FACTS

On October 16, 1990, Olympia Holding Corporation, f/k/a P*I*E Nationwide, Inc. ("P*I*E"), filed a petition for relief under Chapter 11 of the Bankruptcy Code. P*I*E was principally engaged in the business of

motor carrier transportation providing truck-load and less-than-truckload service for customers. P\*I\*E was a licensed motor common carrier by the Interstate Commerce Commission ("ICC") and subject to the provisions of the Interstate Commerce Act ("ICA"), 49 U.S.C. §§ 10101, et seq., and the regulations promulgated thereunder by the ICC. In mid–January, 1991, P\*I\*E ceased operations; and on March 11, 1991, the Bankruptcy Court converted Olympia's case into one under Chapter 7, appointing Lloyd T. Whitaker as Chapter 7 Trustee for Olympia.

Fidelcor Business Credit Corporation ("Fidelcor") was Olympia's principal pre-petition lender. Olympia had pledged more than $40 million in accounts receivable to Fidelcor as collateral for money borrowed by Olympia. On March 24, 1991, the Bankruptcy Court granted Fidelcor's motion for relief from the automatic stay and permitted Fidelcor to seek to collect alleged freight undercharges from former customers of P\*I\*E. The Trustee maintains that former shippers of P\*I\*E owe more than $200 million in "undercharges," the difference between the full filed tariff and an alleged illegal discounted tariff rate. On July 20, 1991, the Trustee began filing adversary proceedings against former customers of P\*I\*E to collect the alleged undercharges and other freight charges owed Olympia. To date there are approximately 32,000 such adversary proceedings; one such defendant is Frito–Lay.

P\*I\*E claims its tariff rates containing shipper account codes are illegal because there is nothing on file to indicate the identity of the shipper receiving a particular discount rate. Although P\*I\*E filed its coded tariffs with ICC approval, *Special Tariff Authority, Customer Account Numbers, Ryder/P\*I\*E,* No. 85–144, February 14, 1985, the Trustee now claims it was improper to file these coded rates. The Trustee argues that the rates should be considered void, resulting in a complete loss of discount to the shipper. Because there was no discount rate effectively filed, the argument goes, the Trustee is required, under the filed rate doctrine, to collect the full tariff rate on file. This suit, seeking to collect the difference

between the allegedly illegal coded discount rate and the full filed tariff rate, followed.

## THE ICC AND SHIPPER ACCOUNT CODES

The ICC has the authority to "prescribe the form and manner of publishing, filing, and keeping tariffs open for public inspection under" the ICA. 49 U.S.C. § 10762(b)(1). While "[a] motor common carrier shall publish and file with the Commission tariffs containing the rates for transportation it may provide," the ICC "may prescribe other information that motor common carriers shall include in their tariffs." 49 U.S.C. § 10762(a)(1). The ICC has established regulations governing the publication, posting, and filing of tariffs and related documents. *See* 49 C.F.R. §§ 1312 & 1314. These regulations provide for the means of filing tariffs, 49 C.F.R. § 1312.4, the maintenance of effective and proposed tariffs at a carrier's principal office and other locations as well as the posting of notices indicating that the tariffs are available for public inspection, 49 C.F.R. § 1312.5, and the procedures a carrier must follow when applying for special tariff authority to depart from the regulations, 49 C.F.R. § 1312.2.

In discharging its duties under the ICA, the ICC has maintained a policy of approving the practice of discounting by carriers. *See, e.g., Petition for Declaratory Order—Lawfulness of Volume Discount Rates by Motor Common Carrier of Property,* No. 38728, 365 I.C.C. 711, 1982 ICC LEXIS 42 (1982). The ICC has taken the position that it will address any concerns of discrimination resulting from various forms of discounting on a case-by-case basis. Should a claim of discrimination arise from a discounting practice it would be the shipper's responsibility to prove unreasonable discrimination in violation of 49 U.S.C. § 10741. *Id.,* 1982 ICC LEXIS 42 at \*11, n. 6. For the shipper to prove such discrimination, it must show "disparity of rates, competitive injury, and common control by the carrier over the rates charged to both the preferred and the prejudiced shipper. If the shipper demonstrates these three elements, the burden then shifts to the carrier to demonstrate that the difference is justified by differing transportation

conditions." *Id.*, 1982 ICC LEXIS 42 at *11 (footnote omitted).

On February 17, 1984, the ICC eliminated the rule contained in 49 C.F.R. § 1310.7(a)(5) that forbade the publishing of rates for a named shipper. *Rates for a Named Shipper or Received*, Ex Parte No. MC–158, 367 I.C.C. 959, 1984 MCC LEXIS 708 (1984). The rule had declared rates published for named shippers as *per se* unreasonably discriminatory. The ICC would now consider the validity or lawfulness of the rates on a case-by-case basis.

> It is quite enough for our purposes here to say that we believe restricting a tariff to a named shipper, receiver, or location is not a *per se* violation of the statutory prohibition against personal discrimination and, therefore, that the irrebuttable presumption contained in the current regulation should be removed. Whether the issue is "preference or prejudice" or "personal discrimination," we conclude that the issue of unreasonable discrimination should be addressed on the merits, on a case-by-case basis, and not by irrebuttable presumptions that assume that these issues can invariably be decided simply by looking at the face of a tariff. The resolution of discrimination issues requires analysis of the relevant factors that must by present to prove unreasonable discrimination or of the circumstances that justify differences in rates.

*Id.*, 1984 MCC LEXIS 708 at *11. The whole tariff system was changed by this decision as carriers could now file a rate applicable to shipper A and another rate applicable to shipper B as opposed to one rate applicable to all shippers along with a complicated discount scheme designed to create a particular rate for shipper A and a different rate for shipper B. The procedure for filing named shipper rates was still to be under the watchful eye of the ICC to make sure that any differences in rates were not unreasonably discriminatory.

The logical extension of the Rates for Named Shipper policy was to allow carriers to list shippers by code "to more fully attain the benefits flowing from the [policy] by facilitating the computerization of [the carrier's] rating and billing process." Ryder/P*I*E Nationwide, Inc., Application No. 104 for Special Tariff Authority for use of shipper account codes, October 8, 1984, p. 1 (attached as Exhibit B to Defendant Frito–Lay's Supplemental Points and Authorities in Support of its Motion for Judgment on the Pleadings). The practice of granting special tariff authority to allow carriers to use shipper account codes began with a decision served February 13, 1985, *Customer Account Numbers*, Special Tariff Authority Roadway Express Inc., No. 84–9406, January 30, 1985 (not published), and continued until the ICC granted a general exception to the tariff rules to allow carriers to utilize shipper account codes. *Outstanding Relief for "Shipper Account Codes"—Individual Motor Common Carriers and Freight Forwarders*, Special Tariff Authority No. 86–639, March 28, 1986, amended April 29, 1986 (not published) ("SPA 86–639"). The ICC concluded that a general authorization of shipper account codes was warranted because

> (1) the increasing number of individual carrier requests seeking availability of this publication privilege; (2) the unnecessary burden placed on carriers, as well as on the Commission's staff, in preparing and processing separate applications by individual carriers or their agents; and (3) the fact that such applications are usually granted.

SPA 86–639 at p. 1. Since that time the ICC has consistently upheld the use of shipper account codes [1] reasoning that

---

1. A Report from the Office of Compliance and Consumer Assistance of the ICC dated August 24, 1990, suggests that named shipper discounts are *"per se* discriminatory" and "in conflict with the basic concept of common carrier ratemaking." Report, p. 21. The report also concludes that shipper account codes only further the discriminatory nature of named shipper rates "because 'code' discounting conceals the identity of the benefitting shipper, its proliferation challenges a principal safeguard against discrimination recognized in *Rates for a Named Shipper or Receiver*, 367 I.C.C. 959 (1984), *i.e.*, the complaint process." Report, p. 22. The ICC has disagreed and maintained its position that a case-by-case approach is the more appropriate and efficient means of determining whether the use of named shipper rates or the use of shipper account codes is unreasonably discriminatory in violation of 49 U.S.C. § 10741. *Regular Common Carrier Conference—Petition for Declaratory Order—Range of Discounts and Customer Account Codes*, No. MC–C–30117, 8 I.C.C.2d 47, 54 (1991).

[i]f a tariff lacks any of the essential information concerning the commodities, service points, and rate information, it is not the use of a customer code that would invalidate the tariff. Conversely, mere use of shipper codes does not mean necessarily that the tariff lacks any necessary information.

*Regular Common Carrier Conference—Petition for Declaratory Order—Range of Discounts and Customer Account Codes,* No. MC–C–30117, 8 I.C.C.2d 47, 54 (1991) (footnote omitted).

The ICC, in light of this litigation, similar litigations in other jurisdictions, and at the request of Congress, has initiated a review of "all outstanding Special Tariff Authorities that allow carriers to publish tariff rates for shippers identified only through the means of account codes listed in the tariffs." *Reconsideration of Special Tariff Authorities Authorizing the Publication of Customer Account Codes in Tariffs,* No. 40888, 1992 ICC LEXIS 302 (served January 5, 1993). Comments were due on March 8, 1993, but no decision has been issued.[2] As of this opinion, the ICC maintains its policy of allowing carriers to publish tariff rates containing shipper account codes.

### THE ISSUE BEFORE THE COURT

The issue to be decided is whether the Plaintiff, as Trustee in bankruptcy for the bankrupt carrier P*I*E, has standing to challenge the legality of P*I*E's rates on file with the ICC based on the theory that the tariff rates filed with shipper account codes are in violation of the ICA, and, therefore, void *ab initio.* This Court need not, and it does not decide whether the ICC's policy of allowing the use of shipper account codes in a carrier's filed tariffs violates the ICA.

### PLAINTIFF'S STANDING TO BRING THIS UNDERCHARGE ACTION BASED ON THE THEORY THAT CODED SHIPPER RATES ARE ILLEGAL

#### I. The Concept of Standing.

It is well known that Article III of the U.S. Constitution established federal courts as

courts of limited jurisdiction. The concept of standing developed in recognition that federal jurisdiction is limited, in part, to actual "cases" and "controversies." While the cases applying the various doctrines of federal jurisdiction, including standing, may be confusing and at times inconsistent, the Court must determine whether Plaintiff is the proper party to bring this action. The Supreme Court explained the importance of the standing requirement and its relation to Article III in *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984):

> Article III of the Constitution confines the federal courts to adjudicating actual "cases" and "controversies." ... [T]he "case or controversy" requirement defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded. The several doctrines that have grown up to elaborate that requirement are "founded in concern about the proper—and properly limited—role of the courts in a democratic society."

> > "All of the doctrines that cluster about Article III—not only standing but mootness, ripeness, political question, and the like—relate in part, and in different though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and explicit theory, and about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." *Vander Jagt v. O'Neill,* 699 F.2d 1166, 1178–1179 (D.C.Cir.1983) (Bork, J., concurring).

> The case-or-controversy doctrines state fundamental limits on federal judicial power in our system of government.

> The Art. III doctrine that requires a litigant to have "standing" to invoke the power of a federal court is perhaps the most important of these doctrines. "In essence the question of standing is whether the litigant is entitled to have the court

---

2. The ICC, in its May 25, 1993, voting conference on Docket Nos. 40887 & 40888, "announced [its] decision that range tariffs and certain customer account code tariffs do not fully comply with the statutory rate disclosure requirements." *Revision of Tariff Regulations—Indexes,* Ex Parte No.

MC–211, 1993 MCC LEXIS 113 at *21, n. 27 (served August 5, 1993). No formal opinion has been issued, however, concerning the future of the customer account codes in tariffs on file with the ICC.

decide the merits of the dispute or of particular issues." ... Standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.... The requirement of standing, however, has a core component derived directly from the Constitution. A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.

*Id.,* 468 U.S. at 750–751, 104 S.Ct. at 3324–3325 (citations omitted).

To determine whether the Trustee has standing to bring this undercharge action, the Court will have to determine (1) whether the Trustee has standing to challenge the legality of rates filed in accordance with ICC rules and regulations and (2) whether this Court has jurisdiction to grant the relief sought by the Trustee. But first, understanding that a prerequisite for Plaintiff to receive any relief is for this Court to determine that the ICC's shipper account code policy is contrary to the dictates of the ICA, this Court must determine whether it has jurisdiction to review the ICC policy.

## II. The Hobbs Act: This Court Lacks Jurisdiction To Enjoin, Set Aside, Suspend, Or Determine The Validity Of The ICC's Rule Allowing The Use Of Shipper Coded Rates.

■ The necessary prerequisite to Plaintiff's undercharge claims is for this Court to find that the ICC's rule of allowing the use of shipper account codes is in excess of the ICC's statutory authority. This Court finds

that it lacks jurisdiction to make such a determination.

Review of ICC decisions is governed by the Administrative Orders Review Act of 1950, otherwise known as the Hobbs Act. The Act provides that

[t]he court of appeals ... has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—

\* \* \* \* \* \*

(5) all rules, regulations, or final orders of the Interstate Commerce Commission made reviewable by section 2321 of this title [that being any rule, regulation, or order of the ICC] and all final orders of such Commission made reviewable under section 11901(j)(2) of title 49, United States Code [providing for the assessment of civil penalties for violations of ICC rules and regulations.]

28 U.S.C. § 2342. While Plaintiff may be able to challenge the seven-year-old rule on the grounds it exceeds the ICC's statutory authority when the rule is applied to Plaintiff[3], *see State of Texas v. United States,* 749 F.2d 1144, 1146 (5th Cir.1985), that challenge would have to be brought in the court of appeals. This Court's jurisdiction with regard to orders of the ICC is limited to instances contained in 28 U.S.C. § 1336. Because this case does not fit into the category of cases contained in 28 U.S.C. § 1336, this Court does not have jurisdiction to hear Plaintiff's challenge to the ICC policy.

Without jurisdiction to determine the validity of the ICC's rule on the use of shipper account codes, this Court is unable to grant Plaintiff any relief. This Court is bound to apply the ICC's rules and regulations not determined invalid by the court of appeals and to apply the filed rate doctrine. As long as the coded shipper rates are on file with the ICC without having been declared void or unreasonable, those rates are the only

---

**3.** It is questionable whether the rule the Trustee challenges was ever "applied" to P\*I\*E. The Trustee sought and received an injunction from the bankruptcy court against the ICC's show cause proceeding that threatened to apply the filed rate doctrine to preclude the Trustee from disavowing P\*I\*E's coded rates filed in compliance with Special Tariff Authority No. 85–144.

The Court makes no determination of the court of appeals jurisdiction to hear Plaintiff's claim under the Hobbs Act. This Court only finds that it does not have jurisdiction to "enjoin, set aside, suspend (in whole or in part), or to determine the validity of" the ICC's shipper account code policy announced in Special Tariff Authority No. 85–144 and Special Tariff Authority No. 86–639.

rates the Trustee may collect. *Maislin Industries, U.S. v. Primary Steel, Inc.*, 497 U.S. 116, 125–128, 110 S.Ct. 2759, 2765–2766, 111 L.Ed.2d 94 (1990). Because this Court does not have jurisdiction to declare the coded shipper rates invalid and the coded rates charged were the rates on file, there is no basis for the Trustee to maintain this undercharge suit. Accordingly, Defendant is entitled to judgment on this undercharge claim.

### III. The Trustee Lacks Standing To Challenge The Validity Of The Coded Shipper Rates.

Assuming, *arguendo*, that this Court had jurisdiction to hear a challenge to the ICC's shipper account code policy as it relates to P*I*E's filed tariffs, the question becomes whether the Trustee is the proper party to bring such a challenge. The Trustee argues that if the rates were filed in violation of the ICA then the rates are void as a matter of law. The Trustee goes on to argue that the ICC's policy of allowing shipper account codes violates the spirit of the ICA and that any rates filed pursuant to that policy should be considered void *ab initio*. The Defendant argues that the Trustee doesn't have standing because a carrier does not have standing to challenge the lawfulness of its own rates.

While a motor carrier has standing to bring an undercharge action to collect the filed rate, *see Maislin*, 497 U.S. at 122, 110 S.Ct. at 2764; 49 U.S.C. § 11706(a), this is not your typical undercharge case. The Court in *Maislin* was faced with an undercharge claim where the rate originally charged was never filed with the ICC and the Trustee for the bankrupt carrier sought to collect the difference between the rate charged and the rate on file. Here the Trustee is seeking to have one filed rate declared void and then collect the difference between the void rate, which was originally charged, and another (higher) filed rate. As will be explained below, this is an action the Trustee may not maintain.

The Supreme Court has consistently held that the filed rate is the only rate that a carrier can charge and the only rate a shipper may pay. *Maislin*, 497 U.S. at 125–128, 110 S.Ct. at 2765–2766; *Louisville & Nashville R. Co. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915); *Southern Pacific Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 352, 102 S.Ct. 1815, 1825, 72 L.Ed.2d 114 (1982). "The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate." *Keogh v. Chicago & Northwestern R. Co.*, 260 U.S. 156, 163, 43 S.Ct. 47, 49, 67 L.Ed. 183 (1922); *see also*, 49 U.S.C. § 11916 (stating that a "published or filed rate is conclusive proof ... that it is the legal rate" in actions against a carrier for certain violations of the ICA).

Recognizing the strictness of the filed rate doctrine, the question now becomes, from the Trustee's point of view, whether the shipper coded tariffs were actually "filed." If the rate was duly filed within the meaning of 49 U.S.C. § 10761(a), then that rate is the only rate that can be collected unless later found by the ICC to be unreasonable. The Trustee claims the rates were never "effectively filed" because they failed to disclose on the face of the tariff the identity of the shipper who was receiving a particular rate. There is no dispute that the rates were "on file" with the ICC as required by ICC regulations. The Trustee's claim is that the tariff is not "effective" because it violates a technical requirement of the ICA, namely the full public disclosure of who receives the carrier's rates.

### A. The Trustee does not have standing to challenge the validity of P*I*E's coded shipper rates on the basis the tariff failed to disclose the identity of the shipper receiving a particular rate.

The Trustee argues that because the ICA was to eliminate secret deals and favoritism, the use of shipper account codes violates the spirit of the ICA by keeping the identity of the shipper receiving a particular rate hidden. The purpose of having tariffs open for public inspection was recently explained in *Freightcor Services, Inc. v. Vitro Packaging, Inc.*, 969 F.2d 1563 (5th Cir.1992):

> The courts have long recognized that a central purpose underlying the transportation policy of the Interstate Commerce Act is a Congressional mandate that the ICC regulate the relationship between carriers and agents to prevent secrecy in the negotiations of tariffs, which promotes discrimination, favoritism, market inefficiency, and artificially high rates.... Simply put,

public disclosure of the parties to each tariff promotes fairness and helps to level the playing field on which the players must know whom they are playing with and against."

*Id.* at 1570. This concept of publication and public inspection is meaningless unless a shipper is able to determine not only what his rate will be but also what the rate of his competitor will be. *United States v. Chicago & A. Ry. Co.,* 148 F. 646 (N.D.Ill.1906), *aff'd* 156 F. 558 (7th Cir.1907), *aff'd* 212 U.S. 563, 29 S.Ct. 689, 53 L.Ed. 653 (1909).

■ The Trustee relies on *Regular Common Carrier Conference v. United States,* 793 F.2d 376 (D.C.Cir.1986) ("RCCC"), to suggest that because the public, other shippers, and competitors of P*I*E could not tell from the face of the tariff what rate Frito–Lay was receiving the coded tariff rates are illegal. First of all, the Trustee does not have standing to sue to protect the interests of the public, shippers other than Frito–Lay, or its own competitors. *See Allen v. Wright,* 468 U.S. at 751, 104 S.Ct. at 3324 (noting that Plaintiff cannot sue to protect a third party's rights); *McGowan v. Maryland,* 366 U.S. 420, 429, 81 S.Ct. 1101, 1107, 6 L.Ed.2d 393 (1961) (holding that department store that did not "allege any infringement of their own religious freedoms due to Sunday closing" did not have standing to challenge the Sunday closing laws on behalf of those allegedly suffering harm). Additionally, any harm resulting from the failure of P*I*E to publish the names of the shippers as opposed to just the codes is suffered not by the carrier publishing the rates, P*I*E, but rather by some other party. The Trustee, as the representative of the carrier, does not have standing to

make a claim on behalf of a third-party and does not have standing to make this argument on behalf of the bankrupt estate because P*I*E has suffered no harm resulting from the failure to publish the name of the shipper. *See ICC v. Transcon Lines,* 990 F.2d 1503, 1516 (9th Cir.1992) (finding that "[t]he publication requirement of the statute is designed to protect carriers against discrimination and to protect carriers against the competitive disadvantage they may suffer if other carriers discriminate. It is not designed to allow carriers, or their successors in bankruptcy, to repudiate their own filed rates in hopes of collecting a higher rate.").[4]

The Trustee also argues that because one shipper cannot determine the rate another shipper is being charged the tariff fails to meet the requirements of 49 U.S.C. § 10761(a) that "the rate ... [be] contained in a tariff that is in effect." There are two problems with the Trustee's argument here. The first is that the Trustee is once again asserting the rights of a third-party which is impermissible. The second is that the rate is readily determinable from the face of the tariff. The fact that the shipper is not identified makes no difference to the determination of a *rate.* In *RCCC,* the "averaging rule" struck down did not provide a methodology for calculating the "average." A shipper did not know how the carrier was going to calculate its rate and did not know if the carrier would use the same formula for the shipper's competitor. All that is required under the ICA is that the rate be ascertainable from the face of the tariff, 49 U.S.C. § 10762(a)(1), and in this case, the rates are clear from the face of the tariff. Just because shipper A does not know shipper B's

4. After the Ninth Circuit's opinion both parties petitioned the Supreme Court for a writ of certiorari. On June 14, 1993, the Supreme Court granted the ICC's petition for a writ of certiorari and remanded the case for reconsideration in light of *Reiter v. Cooper,* 507 U.S. ——, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). *Interstate Commerce Commission v. Transcon Lines,* —— U.S. ——, 113 S.Ct. 2955, 125 L.Ed.2d 657 (1993). *Reiter* held that in cases where a bankrupt carrier is suing for undercharges a shipper may maintain a counterclaim against the carrier for reparations based on the unreasonableness of the rates without having to first pay the filed rate.

That opinion is not relevant to the issue currently before the Court.

Also on June 14, 1993, the Supreme Court denied Transcon's petition for a writ of certiorari. *Gumport v. Interstate Commerce Commission,* —— U.S. ——, 113 S.Ct. 2987, 125 L.Ed.2d 683 (1993). The issue the Supreme Court refused to hear undoubtedly concerned the Ninth Circuit's ruling on the trustee's standing to challenge the validity of the carrier's coded shipper rates. While this Court is not bound by the Ninth Circuit's holding that opinion remains persuasive authority.

code does not mean shipper A cannot calculate the rates to be charged. ICC regulations and 49 U.S.C. § 10762, provide for certain information to be contained in a tariff; neither requires the name of a particular shipper to be contained in a tariff. Because a shipper could calculate the rate to be charged, even if it does not know who is entitled to that rate, this case is distinguishable from *RCCC.*

**B. The Trustee's challenge to P\*I\*E's coded shipper rates is a challenge to their "lawfulness," not their "legality."**

The Trustee relies on language in *I.C.C. v. Transcon Lines, supra,* for his position that he has standing to challenge the "legality" of P\*I\*E's coded rates. In *Transcon,* the Ninth Circuit did point out that a carrier does have "standing to challenge the legality of its own rates." *Id.* at 1515 (citing *Maislin, supra* ). However, the court also noted that "[a]ny challenge to a filed rate is a challenge to its 'lawfulness,' " *Id.,* and a carrier does *not* have standing to challenge the "lawfulness" of its own rates. *Id.* at 1516. The important thing to determine at this stage, therefore, is whether the Trustee is actually challenging the "legality" or the "lawfulness" of P\*I\*E's coded rates.

The Trustee attempts to play a linguistic game by framing his argument as one challenging the "legality" of P\*I\*E's coded rates rather than a challenge to the rates "lawfulness." It has been recognized that the filed rate doctrine "is premised on a distinction between a "legal" rate and a "lawful" rate. The *legal* rate is the tariff rate published and filed with the I.C.C. The *lawful* rate is a legal rate which has also been determined by the Commission to be reasonable and acceptable under the requirements of the Interstate Commerce Act." *Southern Pacific Transp. Co. v. San Antonio, Tex.,* 748 F.2d 266, 273–74 (5th Cir.1984) (citations omitted) (emphasis added). Under the ICA a "shipper [is] bound to pay the legal rate; but if he [can] show that it [is] unreasonable he might recover reparation." *Maislin,* 497 U.S. at 128, 110 S.Ct. at 2767 (quoting *Arizona Grocery Co. v. Atchison, T. & S.F.R. Co.,* 284 U.S. 370, 384, 52 S.Ct. 183, 184, 76 L.Ed. 348 (1932); *see also, Southern Pacific,* 748 F.2d at 274. Part of the "reasonableness" requirement for the filed rates is that the rates

not be discriminatory. 49 U.S.C. § 10741; *Maislin,* 497 U.S. at 128, 110 S.Ct. at 2767; *Southern Pacific,* 748 F.2d at 274.

 The rates P\*I\*E had on file with the ICC, unless unreasonably discriminatory, are lawful. The Trustee, however, does not claim that the rates themselves are discriminatory, but rather that the publishing of the shipper account codes as opposed to shipper names is discriminatory. This distinction has no legal significance. It is important to remember that the ICA only requires that the tariff contain the rate to be charged and is silent about the need to identify what shippers are receiving what rate. *See* 49 U.S.C. § 10761. The concept of naming shippers in a tariff did not develop until the ICC's Named Shipper Rates decision in 1984, as was discussed previously. The gravamen of the Trustee's argument is that shippers will be unable to use the complaint process to assure non-discriminatory treatment because they will not be able to determine from the face of the tariff what their competitors are being charged.[5] Because the crux of the Trustee's argument is not whether the rates were actually filed within the meaning of 49 U.S.C. §§ 10761–10762, but whether the coded rates violate the requirement that rates not be discriminatory, 49 U.S.C. § 10741(a), the Trustee is actually challenging the "lawfulness" of the coded rates and not their "legality."

This linguistic analysis aside, the Ninth Circuit's opinion in *Transcon, supra,* is directly on point. In denying the Trustee standing the court found that it had "no power to grant Transcon reparations [undercharges] for its own unlawfulness." *Transcon,* 990 F.2d at 1516. Such a holding makes sense when it is considered that the Supreme Court has held that only a shipper is entitled to reparations, not a carrier. *Burlington Northern, Inc. v. United States,* 459 U.S. 131, 141–142, 103 S.Ct. 514, 521–522, 74 L.Ed.2d 311 (1982). The only exception to that rule can be found in 49 U.S.C. § 10707(d)(2), which allows carriers to collect undercharges when part of a rate increase was suspended by the ICC and later found to be reasonable. *Transcon,* 990 F.2d at 1516 (citing *Union Pacific R. Co. v. Nevada Power Co.,* 950 F.2d 1429, 1434 n. 6 (9th Cir.1991)). Because a carrier cannot challenge the lawfulness of its duly filed rates, which is precisely what the

5. The Trustee relies on a Report of the Office of Compliance and Consumer Assistance dated August 24, 1990. This report and its implications on ICC policy were discussed in note 1, *supra.*

Trustee is attempting to do here, the Plaintiff lacks standing to bring this suit.

### IV. This Court Lacks Jurisdiction To Invalidate The Shipper Coded Rates Or Determine An Alternate Applicable Rate.

The Plaintiff's lack of standing is even more evident when it is realized that even if this Court were to invalidate the ICC's policy of allowing carriers to utilize shipper account codes in their filed tariffs such a finding would not lead to the conclusion that the rates contained in those tariffs are invalid or that the tariff is to be considered void *ab initio.* The limits of this Court's authority over carrier rates was explained by the Supreme Court when it held that

> [ (1) ] federal-court authority to reject Commission rate orders for whatever reason extends to the orders alone, and not to the rates themselves, ... [and (2) ] where there is a dispute about the appropriate rate, the equities favor allowing the carrier's rate to control pending decision by the Commission, since under the Act, the shipper may receive reparations for overpayment while the carrier can never be made whole after underpayment.

*Burlington Northern,* 459 U.S. at 141–142, 103 S.Ct. at 521–522. The effect of these limitations on judicial authority over ICC decisions concerning rate determinations and filing procedures is that the federal courts can only declare an ICC decision invalid; federal courts cannot declare the rates filed in accordance with the invalid ICC decision void. *Id.* at 140, 103 S.Ct. at 520 (quoting *Atchison, T. & S.F.R. Co. v. Wichita Board of Trade,* 412 U.S. 800, 818–819, 93 S.Ct. 2367, 2380–2381, 37 L.Ed.2d 350 (1973)). In other words, even if this Court were to strike down the ICC's decisions in Special Tariff Authority No. 85–144 and Special Tariff Authority No. 86–639, that decision would not affect the validity of the rates filed in accordance with those ICC decisions. P*I*E would still be limited to charging and collecting the rates filed with the ICC; i.e., the coded shipper rates. *Transcon Lines,* 990 F.2d at 1517.

The rationale for the Supreme Court's decisions precluding the federal courts from entering orders effectively setting rates is two fold. First, the ICA gives exclusive authority to the ICC over matters of rate reasonableness. *Burlington Northern,* 459 U.S. at 139–140, 103 S.Ct. at 520–521. Second, there is

> long-standing [ICC] and judicial precedent, absent a specific regulation to the contrary, [that] tariffs on file with the Commission are considered effective, filed tariffs, even though later determined to be unlawful for some reason.... The principle underlying these cases in that the ICA provides not for penalties, but rather for compensation for actual harm.... The commission and courts have typically found deficient tariffs applicable in order to prevent shippers from receiving windfall refunds (overcharges) every time a carrier made some technical mistake in filing.... Similarly, absent a specific regulation to the contrary, carriers should not receive automatic windfalls (undercharges) by characterizing as unfiled those tariffs which were on file with the Commission but later found deficient in some respect.

*Range Tariffs of All Motor Common Carriers—Show Cause Proceeding,* Nos. 40887, 40843, 40848, 1992 ICC LEXIS 301 at *31 (served January 5, 1993) (citations and footnotes omitted); *see also, Genstar Chemical Ltd. v. I.C.C.,* 665 F.2d 1304, 1308 (D.C.Cir. 1981) (finding that there is no retroactive rejection of tariffs for "some irregularity in the tariff filing formalities" because the remedy for such a violation "is measured not by looking to some other tariff but by the harm, if any, caused by the unlawfulness or irregularity"); *Magnolia Provision Co. v. Beaumont, S.L. & W. Ry. Co.,* 20 F.2d 384 (S.D.Tex.1927), *affd.* 26 F.2d 72 (5th Cir.), *cert. den.* 278 U.S. 620, 49 S.Ct. 23, 73 L.Ed. 542 (1928) (holding that "[i]t would be intolerable if a carrier could file with the Commission and cause to be published a rate, and then avoid its effect as to a specific shipment by claiming either that it had violated [some] provision of the law, or that it had failed in some technical requirement ..."). The Trustee is essentially claiming that the

P*I*E coded shipper tariffs violate a technical requirement of the ICA. Because a failure to comply with a technical requirement of the ICA does not render a tariff void and the Trustee has shown no injury suffered by P*I*E resulting from the use of shipper account codes, Plaintiff lacks standing to bring this claim.

The Trustee claims that if the tariff is filed in substantial violation of the ICA then the tariff was never "effectively filed" and should be considered non-existent. The Trustee's rationale for claiming that the coded shipper rates are void *ab initio* emanates from the ICC's authority to reject tariffs filed in violation of the ICA or ICC regulations. *See* 49 U.S.C. § 10762(e). Such a rejection would render "whatever tariff was in effect prior to the adoption of the rejected rate [to] become[ ] the applicable tariff for the period during which motor carriers charged the rejected tariff." *I.C.C. v. American Trucking Associations, Inc.,* 467 U.S. 354, 358, 104 S.Ct. 2458, 2461, 81 L.Ed.2d 282 (1984). The result of a rejection of effective rates is dramatic because a shipper would not be limited to actual damages resulting from the application of an unreasonable or discriminatory rate but would be entitled to collect the difference between the rejected rate and the previously filed rate. *Id.* at 361 n. 5, 104 S.Ct. at 2462 n. 5. Plaintiff hopes for just such a result here whereby the coded discount rates would be retroactively rejected leaving the Trustee to collect the higher full bureau rate as the only effectively filed tariff.

■ There is, however, only one narrow instance where the ICC has been given authority to retroactively reject tariff rates that have already gone into effect and that was in *American Trucking, supra,* where the Court in a 5 to 4 decision upheld the ICC's rejection of tariffs filed in substantial violation of a rate-bureau agreement. The circumstances surrounding the ICA's allowance of rate-bureau agreements and the express exemption of rate-bureau agreements from the anti-trust laws weighed heavily in the majority's decision. While the majority did find that retroactive rejection of tariffs filed in substantial violation of rate-bureau agreements was within the discretionary authority of the ICC, the Court was unanimous in

concluding that the ICC lacks a general authority to retroactively reject filed tariffs. The Court found that

[t]o interpret the power to reject as a license to revoke a tariff that the Commission has already accepted would be contrary to the plain language of [49 U.S.C. § 10762(e).] [footnote omitted] ... "[R]ejection is a regulatory device properly used only *prior* to a tariff's effective date." *Delta Air Lines, Inc. v. CAB,* 177 U.S.App. D.C. 100, 121, 543 F.2d 247, 268 (1976) (emphasis in original).

* * * On its face and as applied by the Commission, § 10762(e) offers affected carriers no opportunity to challenge a decision to reject. Rejection is peremptory, and the carrier's only recourse is to submit a corrected tariff. On the other hand, § 10704(b), which deals with the Commission's authority to cancel effective tariffs and to prescribe new rates for the future, provides that the Commission must conduct a full hearing before taking any action. It would be bizarre, to say the least, to interpret § 10762(e) to give the Commission peremptory authority to void effective rates retroactively, when § 10704(b) places procedural constraints on the Commission's authority to take the less drastic step of modifying effective tariffs prospectively.

*Id.* at 362–363, 104 S.Ct. at 2463–2464; *see also, Id.* at 371–372, 104 S.Ct. at 2467–2468 (O'Connor, J. dissenting) (agreeing that "[t]he Court quite correctly reason[ed] that 49 U.S.C. § 10762(e) does not authorize the Commission to reject effective tariffs"); *Southern Motor Carriers Rate Conference, Inc. v. United States,* 676 F.2d 1374, 1377–78 (11th Cir.1982) (holding that the ICC does not have the authority to retroactively reject tariffs after they become effective). The ability to retroactively reject effectively filed tariffs, therefore, is limited to tariffs filed in violation of rate-bureau agreements and does not extend to effective tariffs containing shipper account codes.

The Trustee does not stop there, however. The Trustee claims that because the tariffs contained only shipper account codes the tariff was incomplete and, therefore, not effectively filed. The Trustee relies on the ICC's own decision in *Jasper Wyman & Son, et al.—Petition for Declaratory Order—Certain Rates and Practices of Overland Ex-*

*press, Inc.*, No. 40510, 8 I.C.C.2d 246, 1992 MCC LEXIS 8 (1992), that held that tariffs that refer to mileage guides of another carrier or bureau are void as a matter of law when the carrier has not effectively participated in the mileage guide for failure to maintain an effective concurrence or power of attorney as required by 49 C.F.R. § 1312.-4(d). *See also, Wonderroast, Inc.—Petition for Declaratory Order—Certain Rates and Practices of Transportation Systems International, Inc.*, No. 40387, 8 I.C.C.2d 272 (1992). The ICC concluded, in accordance with 49 C.F.R. § 1312.4(d), that Overland Express, Inc.'s tariff was incomplete and, therefore, not effectively filed because its tariff referred to a mileage guide in which Overland Express did not properly participate. Because the mileage guide could not constitute part of the tariff, Overland Express's tariff was incomplete and could not serve as a basis for an undercharge claim. In reaching its conclusion that the tariff was never effectively filed, the ICC did not address the issue of retroactive rejection of a tariff filed in violation of 49 C.F.R. § 1312.-4(d). *Jasper Wyman,* 1992 MCC LEXIS 8 at *23–24.

Although *Jasper Wyman* was reversed by the Court of Appeals for the District of Columbia Circuit on June 22, 1993, *Overland Express, Inc. v. I.C.C.*, 996 F.2d 356 (D.C.Cir. 1993), several circuits, prior to *Overland Express,* expressed approval of the ICC's holding in *Jasper Wyman.* In upholding the voiding of tariffs filed in violation of 49 C.F.R. § 1312.4(d), the Fifth Circuit concluded that it was within the ICC's discretion to void tariffs not complying with the regulations and that such a method of assuring compliance with the regulations was in furtherance of "the transportation policy of the federal government, which, at the very least, bars secret arrangements among carriers and between carriers and shippers." *Freightcor Services,* 969 F.2d at 1571. The Third Circuit agreed with *Freightcor Services* and concluded that although the carriers rates were effectively filed, the ICC had discretionary authority to void the non-complying rate. *Security Services, Inc. v. K Mart Corp.,* 996 F.2d 1516, 1525 (3rd Cir. 1993).

The Eighth Circuit took a slightly different approach in upholding the ICC's authority to void tariffs not complying with 49 C.F.R. § 1312.4(d). In *Atlantis Express, Inc. v. As-sociated Wholesale Grocers, Inc.,* 989 F.2d 281 (8th Cir.1993), the court concluded:

> In *American Trucking,* the Court made it clear that the ICC may not "nullify effective tariffs retroactively." ... Because we conclude that Atlantis's tariff was not effectively filed, we hold that section 1312.-4(d) does not result in the retroactive rejection of a filed tariff. Atlantis's tariff was not effectively filed because it was incomplete; rates were impossible to calculate from the information Atlantis properly filed with the ICC. We reject the notion that a tariff is "effective" merely because the ICC accepts and publishes a distance rate. In the absence of distances to accompany distance rates, there simply is no tariff on file, notwithstanding the ICC's acceptance and publication of the rates. The rates are meaningless without the distances. We disagree with Atlantis's characterization of its failure to execute a power of attorney as a minor "irregularity" in filing that may not be used to deem the tariff ineffectively filed.... Section 1312.-4(d) sets this "irregularity" apart from those the ICC and Supreme Court have held do not invalidate a filed tariff. Atlantis seeks to have AWG pay its "filed" rate, when it was impossible to calculate the rate from the information Atlantis properly filed with the ICC.

*Id.* at 283. The court in *Atlantis Express* recognized the inherent prohibition of retroactive rejection of effect tariffs and, therefore, simply found that the tariff was incomplete and not effectively filed because the carrier only had part of a tariff on file. Such is not the case here. P*I*E's tariff contained all the information a shipper would need in order to calculate its rate. The only thing "missing" from P*I*E's tariff was the name of the shipper; information not required by the ICA or ICC regulations.

This Court is troubled with the expansion of *American Trucking*'s holding in *Security Services, supra,* and *Freightcor Services, supra.* In reversing the ICC's decision in *Jasper Wyman,* the court of appeals found that the ICC's application of 49 C.F.R. § 1312.-4(d)'s voiding of non-complying tariffs "turn[ed] the filed rate doctrine on its head.

The Supreme Court has long held that a filed rate is valid despite procedural imperfections and even if it reflects a substantive violation of the ICA." *Overland Express*, 996 F.2d at 360–361 (citing *Davis v. Portland Seed Co.*, 264 U.S. 403, 425, 44 S.Ct. 380, 384, 68 L.Ed. 762 (1924)). The Supreme Court made it clear in *American Trucking* that the retroactive rejection of effective tariffs was to occur only in the most narrow and exceptional circumstances. The reason being "[t]he section of the [ICA] on which the filed rate doctrine is based, 49 U.S.C. § 10761(a), does not make every defect in the filed tariff absolutely disqualifying. Rather, it provides that a 'carrier may not charge or receive a different compensation for that transportation or service than the *rate* specified in the tariff.' 49 U.S.C. § 10761(a) (emphasis added). (It is perhaps for this reason that there is a filed *rate* doctrine and not a filed *tariff* doctrine.)" *Id.*, 996 F.2d at 361 (emphasis in original). "As long as the tariff documents 'were received and placed on file by the Commission without any objection whatever as to their form and ... were adequate to give notice' of the rate to be charged, the filed rate doctrine applies." *Id.* (citations omitted); *see also, Security Services, Inc. v. P–Y Transportation, Inc.*, 3 F.3d 966 (6th Cir.1993) (following *Overland Express* ).

█ This Court agrees. Once P*I*E filed its rates with the ICC and utilized the shipper account codes with ICC approval, P*I*E is bound by the filed rate doctrine to collect only the rates it has on file. P*I*E set the rates it charged Frito–Lay and filed those rates with the ICC. The fact that those rates were contained in a tariff utilizing shipper account codes has no effect on the validity of the rates themselves. The Trustee is prohibited, by the filed rate doctrine, from charging any rate other than that filed rate.

This Court is without authority to go back and declare void rates properly filed in 1985. Even should this Court find that the use of shipper account codes violates the dictates of the ICA that would not invalidate the rates contained in the non-complying tariff. The relief would only be prospective. It would be patently unfair for this Court to order shippers who, without objection, accepted and paid the rate on file, a rate filed in a tariff complying with ICC requirements, to now pay a higher rate because P*I*E filed its

tariffs in a manner that is technically in violation of the ICA. *Magnolia Provision,* 20 F.2d at 385. The Trustee lacks standing to make such a request.

### CONCLUSION

This Court lacks jurisdiction to declare the ICC's shipper account code policy illegal. Additionally, there is no basis in law for this Court to declare the shipper coded tariffs void *ab initio*. There is no basis in law for this Court to declare the full tariff rate the applicable rate for the shipments in question. In short there is no basis in law for this Court to grant Plaintiff any relief whatsoever.

This Court finds Plaintiff's arguments concerning the validity of the shipper account code policy persuasive and maybe the use of such codes is contrary to the spirit of the ICA. Those arguments, however, are absolutely irrelevant in determining the issue before the Court and no comment of this Court is to be construed as the expressing of an opinion one way or the other on the validity of the ICC's shipper account code policy. This Court is to determine solely whether the Trustee has standing to bring this suit challenging the validity of P*I*E's filed tariffs that contain shipper account codes. This Court concludes that the Trustee does not have such standing.

Accordingly, for the reasons stated herein, it is now

**ORDERED AND ADJUDGED:**

1. Defendant's Motion for Judgment on the Pleadings (docket no. 7) is GRANTED. Judgment shall be entered in favor of Defendant with respect to Count II of the complaint.

2. Motion of Frito–Lay Inc. for Leave to File Reply Memorandum (docket no. 33) is DENIED. The clerk is directed to return the Reply Memorandum of Defendant Frito–Lay as unfiled.

3. Plaintiff's Motion to Strike the Supplemental Memorandum of Defendant Continental American Corporation, the Supplemental Memorandum of the United States and the Interstate Commerce Commission, and Portions of the Supplemental Memorandum of Frito–Lay, Inc. (docket no. 29) is DENIED.

**DONE AND ORDERED.**

## ORDER

Oct. 28, 1993.

This cause is before the Court on Plaintiff's Motion for Reconsideration of this Court's Order of September 13, 1993 (docket no. 43). Defendant has filed a timely response.

This Court specifically stated in its September 13, 1993, order that it expressed no opinion on the validity of the ICC rule allowing the use of coded shipper rates. Order pp. 189 & 197. Plaintiff, nevertheless, points to the ICC's ruling in *Reconsideration of Special Tariff Authorities Authorizing the Publication of Customer Account Codes in Tariffs,* Docket No. 40888, 1993 WL 330000, 1993 MCC LEXIS 135 (September 1, 1993), as support for Plaintiff's argument that P*I*E's tariffs violated the ICA and should be considered void *ab initio.* In its decision, the ICC determined that the use of customer account codes without the publishing of either an index of what shipper goes with what code or a specific description of the commodities and the city and state of origin or destination for each applicable rate did not comply with the requirements of 49 U.S.C. § 10762(a)(1). Plaintiff argues that because P*I*E's tariffs do not meet these requirements, P*I*E's coded discount tariffs were never "duly filed" or "effective." Plaintiff may be correct that under this recent decision of the ICC P*I*E would be required to replace its tariffs in order to comply with the new rules to be promulgated in the wake of this decision and Plaintiff may also be correct that P*I*E's tariffs as they now exist are not in compliance with the technical dictates of 49 U.S.C. § 10762(a)(1), but such a conclusion is irrelevant to this Court's determination that Plaintiff lacks standing to challenge the lawfulness of its own rates.

Plaintiff argues that the tariffs are illegal because they fail to provide shippers and the public a means of determining who is receiving what rate. Plaintiff concedes that a shipper is able to determine what rate is applicable to that shipper from the face of the tariff because each shipper knows its own code. Plaintiff's Motion for Reconsideration, p. 8. The complaint, therefore, is that other shippers cannot compare the rate they are being charged with the rate a competitor is being charged. As this Court stated in its order of September 13, 1993, Plaintiff, as Trustee of the bankrupt carrier, lacks standing to challenge a tariff on these grounds. Order, pp. 192–93.

Plaintiff argues that *Regular Common Carrier Conference v. United States,* 793 F.2d 376 (D.C.Cir.1986), requires a finding that the P*I*E tariffs were never effectively filed because critical information was missing form the tariff. *RCCC,* however, is not helpful to Plaintiff's cause here. While the court in *RCCC* did strike down an ICC rule concerning the filing of tariffs because the rule failed to comply with the disclosure requirements of 49 U.S.C. § 10762(a)(1), the court was not faced with a carrier attempting to invalidate previously filed tariffs on the grounds that the tariffs were filed in compliance with the invalid rule. *RCCC* did not address the ability of a carrier to challenge its own tariffs. *RCCC* did not address the retroactive rejection of tariffs filed pursuant to the invalid rule. In short, *RCCC* provides no insight into the issues relevant to determining Plaintiff's standing to bring this suit.

Even if the ICC policy allowing the use of coded shipper rates is in violation of the ICA, and it appears the ICC has concluded that in some instances the use of such rates does violate the ICA, that would still not provide Plaintiff with standing to bring this action for the reasons stated in the September 13, 1993, order. Accordingly, it is now

ORDERED AND ADJUDGED:

Plaintiff's Motion for Reconsideration (docket no. 43) is DENIED.