989 F.2d 643
 Fed. Carr. Cas. P 83,814, 61 USLW 2589
 Vedder J. WHITE, Trustee for Lyons Transportation Lines,
Inc.; Carrier Service, Inc., Agent for Jones Truck Lines
Inc.; Trans-Allied Audit Company, Inc.; and Interstate
Audit Corporation, Petitioners in No. 92-3528,
International Brotherhood of Teamsters, Intervenor-Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondent,
National Transportation League, Intervenor-Respondent.
Langdon M. COOPER, Trustee in Bankruptcy for Bulldog
Trucking, Inc. and Allstate Financial Corporation,
Petitioners in No. 92-3631,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
Lloyd T. WHITAKER, Trustee for Olympia Holding Corp. f/k/a
P*I*E Nationwide, Inc., Fidelcor Business Credit
Corporation, Phoenix Advisors & Collections, Inc. and IU
International Corporation, Petitioners in No. 92-3653,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
Leonard L. GUMPORT, Trustee of the Bankruptcy Estate of
Transcon Lines, Petitioner in No. 92-3666,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondent,
National Industrial Transportation League, International
Brotherhood of Teamsters, Chauffeurs, Warehousemen &
Helpers, National American Wholesale Grocers' Association
("NAWGA") (Intervenors per order dated 11/2/92 from The USCA
for the Ninth Circuit).
 Nos. 92-3528, 92-3631, 92-3653 and 92-3666.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 8, 1993.
Decided March 19, 1993.
 
 Thomas M. Auchincloss, Jr., Brian L. Troiano (argued), Leo C. Franey, Rea, Cross & Auchincloss, Washington, DC, for petitioners in No. 92-3528.
 Joseph L. Steinfeld, Jr. (argued), Robert B. Walker, John T. Siegler, Sims, Walker & Steinfeld, Washington, DC, for petitioners in Nos. 92-3631 and 92-3666 Leonard I. Gumport, etc.
 Langdon M. Cooper (argued), Alala, Mullen, Holland & Cooper, Gastonia, NC, for petitioner in No. 92-3631 Trustee.
 Steven M. Pesner (argued), Anderson, Kill, Olick & Oshinsky, New York City, for petitioner in No. 92-3653 IU Intern. Corp.
 Kim D. Mann, Shawn, Mann & Neidermayer, Washington, DC, for petitioners in No. 92-3653 Lloyd T. Whitaker, Trustee for Olympia Holding Corp. a/k/a P*I*E Nationwide, Inc., Fidelcor Business Credit Corp. and Phoenix Advisors & Collections, Inc.
 Gardner Davis, Foley & Lardner, Jacksonville, FL, for petitioner in No. 92-3653 Lloyd T. Whitaker, Trustee for Olympia Holding Corp. a/k/a P*I*E Nationwide, Inc.
 George E. Ridge, Kent, Ridge & Crawford, Jacksonville, FL, for petitioner in No. 92-3653 Fidelcor Business Credit Corp.
 W. Kelsea Wilber, Phoenix Advisors & Collections, Inc., Jacksonville, FL, for petitioner in No. 92-3653 Phoenix Advisors & Collections, Inc.
 Marjorie S. Steinberg, Tuttle & Taylor, Los Angeles, CA, for petitioner in No. 92-3666.
 Leonard L. Gumport, trustee in Bankruptcy for Transcon Lines.
 Charles A. James (in No. 92-3528), Asst. Atty. Gen., J. Mark Gidley, Acting Asst. Atty. Gen., John P. Fonte (argued), Robert B. Nicholson, U.S. Dept. of Justice, Antitrust Div., Washington, DC, for respondents in Nos. 92-3528 and 92-3666 U.S.
 Robert S. Burk, Gen. Counsel, Henri F. Rush, Gen. Counsel, Ellen D. Hanson, Sr. Associate Gen. Counsel, Evelyn G. Kitay (argued), Virginia Strasser, Theodore K. Kalick, Interstate Commerce Com'n, Washington, DC, for respondent in Nos. 92-3528, 92-3631, 92-3653 and 92-3666, Interstate Commerce Com'n.
 Kurt Stohlgren, Hillix, Brewer, Hoffhaus, Whittaker & Wright, Kansas City, MO, for amicus curiae in No. 92-3528, American Freight System, Inc.
 Marc J. Fink, Torbjorn B. Sjogren, Sher & Blackwell, Washington, DC, for intervenor petitioner in No. 92-3666, Intern. Broth. of Teamsters & Helpers.
 Terrence D. Jones, Keller & Heckman, Washington, DC, Nicholas J. DiMichael, Frederic L. Wood, Donelan, Cleary, Wood & Maser, P.C., Washington, DC, for intervenors the Nat. Indus. Transp. League and the National-American Wholesale Grocers' Ass'n, Inc.
 Frederic L. Wood (argued), Donelan, Cleary, Wood & Maser, P.C., Washington, DC, for intervenor respondent in No. 92-3666, the Nat. Indus. Transp. League.
 Before: MANSMANN and NYGAARD, Circuit Judges, and DALZELL, District Judge.*
 OPINION OF THE COURT
 MANSMANN, Circuit Judge.
 
 
 1
 This matter comes to us on consolidated petitions to invalidate rules, promulgated by the Interstate Commerce Commission, that would permit the Commission to review and determine the facial validity of claims brought pursuant to the "filed rate doctrine" of the Interstate Commerce Act. Because we hold that the Commission's proposed activity is the equivalent of the adjudication of claims, which it concedes it is without authority to do, we will set aside the challenged rules.I.
 
 
 2
 Vedder J. White,[1] other petitioners,[2] the intervenor-petitioner,[3] and the amicus curiae[4] are involved in motor carrier bankruptcies in their capacities of trustees, debtors-in-possession, collection agents, auditing companies, or creditors. They allege that in order to recoup money for these bankruptcy estates, trustees are bringing claims against shippers pursuant to the filed rate doctrine. The filed rate doctrine provides that a carrier receive from a shipper no more or no less than the tariff rate on file with the Commission. The purpose of the doctrine is to prevent rate discrimination and secret deals. Shippers, who have constructive notice of the filed rates, are liable for the full rate, and a carrier may institute an "undercharge action" to obtain the difference between the full filed rate and the lower rate originally paid by a shipper to the carrier. See 49 U.S.C. §§ 10761(a),[5] 11706(a)[6]; Maislin Industries, U.S. v. Primary Steel, Inc., 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990).
 
 
 3
 Maislin illustrates one type of "undercharge claim." In Maislin, a carrier had given to shippers unpublished discounts from the filed rate. When the carrier declared bankruptcy, the trustee attempted to collect the undiscounted part of the tariff. Upon referral from the bankruptcy court, the Commission applied a "Negotiated Rates" policy to opine that trustees could not rebill the filed rate for shipments originally billed at a lower, negotiated rate. See 497 U.S. at 122-25, 110 S.Ct. at 2763-65. The Supreme Court held that the Negotiated Rates policy violated the Interstate Commerce Act in that the policy applied an equitable defense to the filed rate doctrine where the Act did not permit one; the trustee's undercharge claims were therefore valid. Id. at 126-36, 110 S.Ct. at 2765-71.
 
 
 4
 Trustees have asserted other types of undercharge claims. For example, in ICC v. Transcon Lines, 981 F.2d 402 (9th Cir.1992), the trustee made claims against some shippers pursuant to the carrier's filed credit rules. Against others, he claimed that they had paid an unlawful rate, which, although filed, contravened the purpose of the filed rate doctrine by not identifying the shipper.[7]
 
 
 5
 Another example of an undercharge claim involves the assertion that the carrier wrongfully provided services pursuant to "contract carriage." Contract carriage is exempt from the filed rate doctrine. The trustee asserts that because the contract rate was invalid, the exemption was invalid, and therefore the higher filed tariff rate should apply under the filed rate doctrine.
 
 
 6
 In Ex Parte No. MC-208: Nonoperating Motor Carriers--Collection of Undercharges, 8 I.C.C.2d 742 (1992) (Undercharge Collections ), the Commission expressed concern that the bringing of undercharge claims by trustees was working a hardship on shippers and commerce because of sloppy audits, settlement demands made with inadequate documentation or basis in law, settlements made at nuisance value, and because of other practices the Commission characterized as "unduly coercive and border[ing] on the fraudulent." 8 I.C.C.2d at 749. In response to these practices, the Commission promulgated the MC-208 Rules ("Rules") challenged here, to be codified at 49 C.F.R. § 1321. The Rules require any carrier that has ceased or is ceasing operations to file representative claims with the Commission, either in advance of or concurrently with a court action. The carrier must stay its pursuit of those claims pending Commission review.
 
 
 7
 The Rules do not apply to Maislin-type claims, which assert that the shipper originally paid an unfiled rate; rather, the Rules apply to claims "based on the substitution of a different (higher) tariff rate for the tariff rate billed at the time of shipment" and to claims "based on the substitution of a common carrier rate for contract carriage charges originally billed." The Rules allow the Commission to review these undercharge claims and to preclude carriers from pursuing claims that the Commission determines are facially invalid. We refer to this process as the Review Process. According to the Commission, "[t]he sole purpose of the MC-208 Rules is to cull out purported claims that have no colorable basis under the ICA." ICC Br. at 33.[8] A decision by the Commission to disapprove a claim would be reviewable in a court of appeals pursuant to 28 U.S.C. §§ 2321(a), 2342(5).
 
 
 8
 The petitioners have challenged the Rules on several bases, including the theory that the Rules violate the Interstate Commerce Act by giving the Commission original jurisdiction to adjudicate undercharge actions, a power vested in the courts, not the Commission.
 
 
 9
 We have jurisdiction of a proceeding to set aside or determine the validity of an ICC rule. 28 U.S.C. §§ 2321(a), 2342(5). We must set aside agency action that is arbitrary or capricious, contrary to constitutional right or power, or in excess of statutory jurisdiction or authority. See 5 U.S.C. § 706(2). We defer to an agency's permissible construction of an ambiguous provision of the statute that the agency administers. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984).
 
 II.
 
 10
 We agree with the view, expressed both by the petitioners and by the Commission, that the Interstate Commerce Act does not authorize the Commission to adjudicate motor carrier undercharge claims in the first instance.[9] Congress gave that authority to the courts, 49 U.S.C. § 11706(a), and the structure of the Act indicates that Congress intentionally withheld it from the Commission. See, e.g., § 11706(b), (c)(1) (referring to Commission's authority to adjudicate claims involving rail and water carriage), § 11708(b) (giving Commission power to consider actions against motor carriers originally filed in district court). Additionally, the Commission has the authority to bring suit to enforce the Act, see § 11702, and the power to sue is to some extent inconsistent with the power to adjudicate. A body with the power to say 'yes' or 'no' with the force of law has little need to sue to enforce its position. See Coit Independence Joint Venture v. Federal S & L Ins. Corp., 489 U.S. 561, 573, 109 S.Ct. 1361, 1368, 103 L.Ed.2d 602 (1989) (remarking that the FSLIC's power to "settle, compromise, or release" claims is inconsistent with the power to adjudicate).
 
 
 11
 We recognize that the Commission may have a role in resolving aspects of undercharge suits under the doctrine of primary jurisdiction, pursuant to which a court should refer to an agency those matters that lie within the agency's expertise or that require a nationally uniform decision. See, e.g., United States v. Western Pacific RR., 352 U.S. 59, 63-64, 77 S.Ct. 161, 164-165, 1 L.Ed.2d 126 (1956). The doctrine of primary jurisdiction, however, applies when a claim is originally cognizable in the courts, id. at 64, 77 S.Ct. at 165, and does not itself authorize an agency to review and determine claims in the first instance. The Commission implied at oral argument that it does not rely on the doctrine as authority to support its adjudication of undercharge claims.[10]
 
 III.
 
 12
 The Commission asserts that its lack of authority to adjudicate is irrelevant because the Rules do not create an adjudicative process. We disagree. The Rules allow adjudication in that they allow the Commission to review claims in the first instance and to disapprove any undercharge claim the Commission deems facially invalid. Cf. 5 U.S.C. § 551(7) (adjudication means agency process for the formation of an order); 4 Jacob A. Stien, Glenn A. Mitchell & Basil J. Mezines, Administrative Law § 33.01, at 33-3 (1992) (defining adjudication as an agency determination (other than rulemaking) of particular rather than general applicability that affects private rights or interests).
 
 
 13
 The Commission's initial disapproval of a claim, subject to appellate review, does not differ in any important respect from the dismissal of a claim pursuant to Rule 12(b)(6) or its equivalent. See Fed.R.Civ.P. 12(b)(6); Bankr.R. 7012(b). Although the Commission has repeatedly emphasized that it will only disapprove claims that have no colorable basis in the Act, the Commission has neglected to distinguish disapproval of a "non-colorable" claim from dismissal under Rule 12(b)(6). Throughout, the Commission has merely labelled the Review Process as "pre-screening," a gloss that cannot disguise, as something other than adjudication, the process of reviewing claims for a determination on the merits of their facial validity. Indeed, the disapproval of a claim on the grounds that it has been inadequately documented, see Undercharge Collections, 8 I.C.C.2d at 766, may be more akin to summary judgment than to a dismissal under Rule 12(b)(6). In this regard, we find it particularly disturbing that, in the event of disapproval, the Commission will have arranged a detour around both the courts' original jurisdiction and the applicable de novo standard of review. While Congress might arrange that sort of detour, the Commission lacks authority to do so.
 
 
 14
 The Commission has also failed to distinguish the Review Process from the FSLIC's process in Coit Independence Joint Venture v. FSLIC, 489 U.S. 561, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989). In Coit, a regulation of the FSLIC, like the Rules here, allowed the agency to deny the claims of creditors and to do so without referral from a court and without de novo review in a court. In striking the FSLIC's process, the Supreme Court took the implicit but unmistakable position that the disallowance of claims was adjudication. Id. at 572, 109 S.Ct. at 1368.
 
 
 15
 The Commission cannot disguise the adjudicative nature of the Review Process by arguing that the Commission will determine the merits only of "non-colorable" claims; partial adjudication is nonetheless adjudication. The Commission also misses the mark when it asserts that it will determine many claims before they ever reach a court; the timing of the Commission's review and disapproval of some claims does not mask the adjudicative nature of the Review Process. Similarly, the Commission misses the mark when it asserts that the Rules allow for the concurrent filing of a court action to preserve meritorious claims; permitting meritorious claims to go forward elsewhere does not change the fact that the Commission would be adjudicating, in the first instance, which claims are not meritorious.
 
 
 16
 Remarkably, the arguments of both the Commission and the United States implicitly acknowledge that the Rules allow adjudication. The United States draws support for the Rules by reference to Rule 11 of the Federal Rules of Civil Procedure, and the Commission describes the Review Process as a complement or an aid to the busy federal courts. Moreover, the Commission expressly recognizes, in the course of a different argument, that "the pre-screening determinations are not different in nature from the ICC's longstanding adjudicatory processes to validate or invalidate undercharge claims." ICC Br. at 44 n. 55.[11]
 
 
 17
 We recognize that the Review Process differs from federal court adjudication in that it does not require the presence of a defendant and is not binding against the defendant. This only underscores the inappropriateness of the process, which gives the Commission both the role of judge and the role of adversary (seeking, as it represents, 8 I.C.C.2d at 749-50, to protect shippers from the very claims it will review). In this respect, we find problematic the Commission's detour around the normal de novo standard of review of summary judgment determinations.
 
 
 18
 Because the Rules embody a process by which the Commission may partially adjudicate motor carrier undercharge claims, and because the Interstate Commerce Act places original jurisdiction of those claims in the courts, not the Commission, we conclude that the Rules are in excess of statutory authority. 5 U.S.C. § 706(2).[12]
 
 IV.
 
 19
 From our conclusion that the Rules would permit adjudication, it follows that the Commission's main argument must fail. That argument--that the Rules are supported by the Commission's broad regulatory authority--depends on the false premise that the Rules do not encompass adjudication. Broad regulatory authority, no matter how expansive, cannot justify the exercise of a power that the Commission concedes it does not have--the power to adjudicate.
 
 
 20
 Assuming arguendo we could characterize the process of reviewing and deciding the facial validity of claims as something other than adjudication, we still do not find any statutory authority to warrant the adoption of the MC-208 Rules. Because the Commission recognizes that explicit statutory power does not exist, it relies instead on implications of such power deduced from general grants of authority under the act. For example, the Commission cites its right to act on its own initiative to take appropriate actions to protect shippers and commerce generally, as well as the Commission's power to tailor remedies to specific situations. See, e.g., United States v. Chicago Heights Trucking Co., 310 U.S. 344, 353-54, 60 S.Ct. 931, 936, 84 L.Ed. 1243 (1940).
 
 
 21
 In the face of the specific congressional decision to vest jurisdiction in the district courts over actions "to recover charges for transportation or service provided by the carrier or freight forwarder" in § 11706(a), we cannot derive a parallel power in the agency to screen undercharged cases by in effect applying common law methods to statutory language. General grants of statutory authority cannot here be regarded as a congressional commission to expand authority as the agency sees fit. Thus, a review of the cases upon which ICC relies demonstrates that accretions of agency authority are only permissible when Congress provides a sufficiently specific statutory warrant.
 
 
 22
 In Chicago Heights, for example, the Supreme Court upheld a Commission determination to strike a discriminatory tariff; that determination lay at the core of the Commission's design to decide whether rate preference or discrimination existed. See 310 U.S. at 352, 60 S.Ct. at 935. The Court's statement that the Commission can act on its own initiative "to protect and maintain a transportation system free from partiality," id. at 354, 60 S.Ct. at 936, does not expand the powers of the Commission beyond those granted in the Act.
 
 
 23
 Nor does ICC v. American Trucking Association, Inc., 467 U.S. 354, 104 S.Ct. 2458, 81 L.Ed.2d 282 (1984) support the Commission's argument that it may broadly extend its powers in order to further statutory mandates. See ICC Br. at 26. In American Trucking, carriers challenged the Commission's authority to reject effective tariffs that had been filed pursuant to "rate-bureau agreements." Especially controversial was a provision for retroactive rejection, which would expose a carrier to retroactive liability. The Court opined that § 10762(e) of the statute authorized rejection, but not retroactive rejection. Nonetheless, the Court upheld the Commission's authority, agreeing with the Commission that
 
 
 24
 retroactive rejection of rate-bureau tariffs is simply an adjunct to the Commission's § 10762(e) rejection authority, and that, to the extent that there is an elaboration on that authority, it is necessary to ensure compliance with rate-bureau agreements.
 
 
 25
 Id., 467 U.S. at 365, 104 S.Ct. at 2464. In so holding, the Court acknowledged "the Commission's authority to modify express remedies in order to achieve legitimate statutory purposes." See id. at 367, 104 S.Ct. at 2465. Similarly, although the Act does not expressly authorize the Commission to suggest pipeline rates, in Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978), the Court held that the Commission's suggestion of a reasonable rate was "an intelligent and practical exercise" of the express statutory power to suspend rates. Id. at 653, 98 S.Ct. at 2066.
 
 
 26
 Here, unlike in American Trucking and Trans Alaska, the Commission has not connected the power to disapprove undercharge claims to any express statutory authority. At oral argument, the Commission attempted to tie the Review Process specifically to 49 U.S.C. § 10743, which authorizes the regulation of credit practices.[13] In conjunction with § 10743, the Commission cited Southern Pacific Transportation Co. v. Commercial Metals Co., 456 U.S. 336, 102 S.Ct. 1815, 72 L.Ed.2d 114 (1982), in which the Court observed thatthe ICC has ample authority to police the credit practices of carriers and thereby to deter improper practices. This authority includes the power to issue a cease-and-desist order, the power to seek a federal-court injunction requiring a carrier to comply with the regulations, and the power to bring suit for the $5,000 civil forfeiture, provided by the [Act], for each knowing violation of an order of the Commission.
 
 
 27
 Id. at 349-50, 102 S.Ct. at 1823-24 (citations omitted). The Commercial Metals case, while alluding to the Commission's authority to regulate credit practices pursuant to § 10743, does not support the Commission's authority to "regulate" in any manner whatsoever. Indeed, to the extent that Commercial Metals does refer to the regulation of credit practices, it alludes only to the Commission's power to intervene in particular cases where the Commission has determined a violation exists, i.e., the power to issue orders, to seek injunctions, or to pursue sanctions. Id. Commercial Metals does not contemplate any power akin to the "pre-screening" procedure defended here.
 
 
 28
 Nor can the Commission support its actions under 49 U.S.C. § 10321(a), which provides that the Commission's authority is not bounded by the powers expressly enumerated in the Act. American Trucking, 467 U.S. at 364-65, 104 S.Ct. at 2464-65. That provision simply authorizes the Commission to take actions that are " 'direct[ly] adjunct to the Commission's explicit statutory power.' " 467 U.S. at 365, 104 S.Ct. at 2464 (quoting Trans Alaska Pipeline Rate Cases, 436 U.S. at 655, 98 S.Ct. at 2067).
 
 
 29
 Furthermore, the Commission cannot legitimize the Review Process by referring to it as a "carefully tailored" remedy. See Gilbertville Trucking Co. v. United States, 371 U.S. 115, 130, 83 S.Ct. 217, 226, 9 L.Ed.2d 177 (1962). In Gilbertville Trucking, the Commission, in order to redress an illegal, de facto merger of two trucking firms in a particular case, required that an officer of one firm divest of his stock in another. Id. In contrast to the order of divestiture at issue in Gilbertville Trucking, the Review Process is not a specific remedy applied to the facts of a particular case. If the Review Process is not adjudication, neither is it a remedy tailored "to the facts of each case." Gilbertville Trucking, 371 U.S. at 130, 83 S.Ct. at 226.
 
 
 30
 Moreover, the Commission has failed to distinguish the statutory framework at play here from the framework in Coit Independence Joint Venture, 489 U.S. at 561, 109 S.Ct. at 1361. In Coit, FSLIC's authority to "settle, compromise, or release claims" did not authorize the process of disapproving claims. Rather than identify any relevant differences between the Commission's statutory powers and FSLIC's statutory powers, the Commission simply asserts that it has demonstrated that the Rules here "are properly grounded upon the ICC's plenary power to investigate and address violations of the ICA." ICC Br. at 32.
 
 
 31
 Certainly, some aspects of these Rules may be "properly grounded upon" an express statutory authority. For example, the requirement that carriers show claims to the Commission might be upheld as an elaboration of the Commission's express authority to investigate violations of the Act. 49 U.S.C. § 11701(a). But the sole purpose of the Rules, as the Commission acknowledges in its brief, is to "cull out purported claims that have no colorable basis in the ICA." ICC Br. at 33. That process--whether labelled "culling out," "pre-screening," or "adjudication"--does not modify or elaborate upon any of the Commission's express statutory powers. Because the Rules would thus create a power in the Commission that is "in excess of statutory authority," 5 U.S.C. § 706(2)(c), we conclude that they are contrary to law.
 
 V.
 
 32
 In support of these Rules, the Commission, the United States, and the intervenor-respondents[14] have urged that a crisis of grave proportions exists, that the undercharge claims are being made contrary to the Interstate Commerce Act, and that the Commission need not stand idly by and wink at violations of the Act. The petitioners do not concede the gravity of any crisis; they suggest that any crisis that might exist has resulted from the Commission's own history of lax enforcement of the filed rate doctrine.
 
 
 33
 While we are impressed with the gravity of the situation on all sides, we note simply that the Commission must use the enforcement powers that it does have; it cannot invent new ones. Indeed, the Commission has used its enforcement powers to intervene in particular cases and advance its view of the law, and it has met some success. See ICC v. Transcon Lines, 981 F.2d 402 (9th Cir.1992) (ruling, in favor of ICC, that a carrier does not have standing to challenge the lawfulness of its own filed rates). We recognize that the enormous volume of claims makes agency intervention impracticable in every case. See Coit, 489 U.S. at 591-92, 109 S.Ct. at 1377-78 (Scalia, J., concurring). In response to such a crisis, however, the Commission may not, without congressional authorization, expand its role to the partial adjudication of undercharge claims.
 
 VI.
 
 34
 Because we find that the process of "pre-screening" of undercharge claims is the process of partial adjudication of undercharge claims, because the Act does not authorize the Commission to adjudicate undercharge claims or to exercise any other power from which the process of disapproving undercharge claims could be legitimately derived, and because this process is--by the Commission's own account--the "sole purpose of the Rules," we will set aside the Rules as in excess of statutory authority.
 
 
 
 *
 Honorable Stewart Dalzell of the United States District Court for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 Trustee for Lyons Transportation Lines, Inc
 
 
 [2]
 These are: At No. 92-3528, Carrier Service, Inc., Trans-Allied Audit Company, Inc., and Interstate Audit Corporation; at No. 92-3631 Langdon M. Cooper, Trustee in Bankruptcy for Bulldog Trucking, Inc., and Allstate Financial Corporation; at No. 92-3653, Lloyd T. Whitaker, Trustee for Olympia Holding Corp. f/k/a P*I*E Nationwide, Inc., Fidelcor Business Credit Corp., Phoenix Advisors & Collections, Inc., and I.U. International Corp.; and at No. 92-3666, Leonard Gumport, Trustee of the Bankruptcy Estate of Transcon Lines
 
 
 [3]
 International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers
 
 
 [4]
 American Freight System, Inc
 
 
 [5]
 49 U.S.C. § 10761(a) provides:
 Except as provided in this subtitle, a carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title shall provide that transportation or service only if the rate for the transportation or service is contained in a tariff that is in effect under this subchapter. That carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff whether by returning a part of that rate to a person, giving a person a privilege, allowing the use of a facility that affects the value of that transportation or service, or another device.
 
 
 [6]
 49 U.S.C. § 11706(a) provides:
 A common carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title or a freight forwarder must begin a civil action to recover charges for transportation or service provided by the carrier or freight forwarder within 3 years after the claim accrues.
 
 
 [7]
 The court upheld the "credit" claims, but rejected the "lawfulness" claims. 981 F.2d at 411, 413
 
 
 [8]
 No. 92-3528. The Commission also submitted, at 92-3666, a joint brief with the United States ("ICC & U.S. Joint Br.")
 
 
 [9]
 This view is an explicit part of the petitioners' argument. The Commission, at oral argument, conceded that it does not have the authority to adjudicate undercharge claims. See also ICC Br. at 19 (acknowledging "the primacy of the courts in adjudicating the merits of undercharge claims")
 
 
 [10]
 The Commission's argument regarding primary jurisdiction, advanced elsewhere, reduces to this:
 To the extent that the regulatory issues would ultimately be referred to the Commission anyway, under the doctrine of primary jurisdiction, these rules simply speed up the process and eliminate the need to pursue and defend against frivolous claims.
 Undercharge Collections, 8 I.C.C.2d at 760. As the Rules call for direct filing of claims with the Commission, the Rules do more than "speed up the process" of referral through primary jurisdiction. The Rules employ a different process altogether. The Commission was therefore correct to acknowledge implicitly at oral argument that primary jurisdiction does not authorize the Review Process.
 
 
 [11]
 The Commission does not rely on this "longstanding" process as precedent to support the Rules
 
 
 [12]
 Because we have concluded that the Rules are contrary to the Interstate Commerce Act, we do not address the petitioners' alternative arguments that the Rules improperly interfere with court dockets, improperly operate retroactively, and violate the Bankruptcy Code and the Constitution
 
 
 [13]
 49 U.S.C. § 10743 provides:
 (a) Except as provided in subsection (b) of this section, a common carrier (except a pipeline or sleeping car carrier) providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under this subtitle shall give up possession at destination of property transported by it only when payment for the transportation or service is made.
 (b)(1) Under regulations of the Commission governing the payment for transportation and service and preventing discrimination, those carriers may give up possession at destination of property transported by them before payment for the transportation or service. The regulations of the Commission may provide for weekly or monthly payment for transportation provided by motor common carriers and for periodic payment for transportation provided by water common carriers.
 (2) Such a carrier (including a motor common carrier being used by a household goods freight forwarder) may extend credit for transporting property for the United States Government, a State, a territory or possession of the United States, or a political subdivision of any of them.
 
 
 [14]
 The National Industrial Transportation League and The National-American Wholesale Grocers' Association, Inc. Only the National Industrial Transportation League filed a brief