In re OLYMPIA HOLDING
CORPORATION, et al.,
Debtors.

Lloyd T. WHITAKER, as Trustee
of the Estate of Olympia Holding
Corporation, Debtor, Plaintiff,

v.

POWER BRAKE SUPPLY,
INC., etc., Defendant.

In re OLYMPIA HOLDING
CORPORATION, et al.,
Debtors.

In re P*I*E UNDERCHARGE
LITIGATION.

Issue: Whether the Negotiated Rates
Act of 1993 is Applicable to
P*I*E Nationwide, Inc.

Nos. 91–1077–Civ–J–16, 94–1–MV–J–16.

United States District Court,
M.D. Florida,
Jacksonville Division.

July 28, 1994.

W. Kelsea Wilber, Law Office of W. Kelsea Wilber, Jacksonville, FL, Jennifer C. Pinson–Harvey, Phoenix Advisors & Collections, Inc., Jacksonville, FL, Steven R. Browning, Robert M. Poppell, c/o The Estate of P.I.E. Nationwide, Inc., Jacksonville, FL, for plaintiff.

John A. Tucker, Caven, Clark & Ray, P.A., Jacksonville, FL, for defendant.

## ORDER

JOHN H. MOORE, II, Chief Judge.

This cause is before the Court on Defendant's Motion to Dismiss Amended Complaint (docket nos. 36 & 5). Plaintiff has filed a response (docket nos. 44 & 8). In accordance with this Court's order of February 28, 1994, establishing this cause as the lead case in determining the applicability of the Negotiated Rates Act of 1993 to P*I*E Nationwide, Inc.'s undercharge claims, several defendants have filed supplemental memoranda.[1] The Plaintiff has filed a reply memorandum (docket nos. 56 & 20).

Also before the Court is Plaintiff's Motion for Continuance and Motion for Relief from Stay of Discovery (docket no. 45). Defendant has filed a timely response (docket no. 49).

## BACKGROUND FACTS

On October 16, 1990, Olympia Holding Corporation, f/k/a P*I*E Nationwide, Inc. ("P*I*E"), filed a petition for relief under Chapter 11 of the Bankruptcy Code. P*I*E was principally engaged in the business of motor carrier transportation providing truck-load and less-than-truckload service for customers. P*I*E was both a licensed motor common carrier and a motor contract carrier by the ICC and subject to the provisions of the Interstate Commerce Act (ICA), 49 U.S.C. §§ 10101, et seq., and the regulations promulgated thereunder by the ICC. Around December 30, 1990, P*I*E ceased operations; and on March 11, 1991, the Bankruptcy Court converted Olympia's case into one under Chapter 7, appointing Lloyd T. Whitaker as Chapter 7 Trustee for Olympia.

Fidelcor Business Credit Corporation ("Fidelcor") was Olympia's principal pre-petition lender. Olympia had pledged more than $40 million in accounts receivable to Fidelcor as collateral for money borrowed by Olympia. On March 24, 1991, the Bankruptcy Court granted Fidelcor's motion for relief from the automatic stay and permitted Fidelcor to seek to collect alleged freight undercharges from former customers of P*I*E. Olympia maintains that former shippers of P*I*E owe approximately $1 billion in "undercharges," the difference between the full filed tariff and an alleged illegal discounted rate. Though most of Plaintiff's claims for undercharges are premised on the illegality of coded shipper discount rates, *see Whitaker v. Frito–Lay*, 160 B.R. 185 (M.D.Fla.1993), Plaintiff also claims undercharges for invalid contract agreements and unfiled negotiated tariffs. On July 20, 1991, the Trustee began filing adversary proceedings against former customers of P*I*E to collect the alleged undercharges and other freight charges owed Olympia. To date there are approximately 32,000 such adversary proceedings. One such defendant is Power Brake.

P*I*E's situation has become far too common in this country over the last five years. Trustees for bankrupt carriers are combing the books looking for any charges yet to be collected. The trustee rebills former clients of the bankrupt carrier for the difference between the rate actually billed and paid and a higher rate on file with the ICC. Congress

---

1. Those filing supplemental memoranda were Thomasville Furniture Industries and American Olean Tile Company, Inc. (docket no. 13), the GTE Corporation (docket no. 11), the Dial Corp, Greyhound Exposition Services and Hausman Bus Service, Inc. (docket no. 14), Continental American Corporation (docket no. 15), and the United States and the Interstate Commerce Commission (docket no. 12).

became aware of the situation affecting many courts and thousands of businesses (former customers of the bankrupt carriers) and decided to act. On December 3, 1993, the President signed the Negotiated Rates Act of 1993, Pub.Law 103–180, 107 Stat. 2044 (1993) ("NRA"). The impact of this new law on the P\*I\*E estate or, more accurately, on the viability of P\*I\*E's undercharge claims is at issue.

## APPLICABLE STATUTORY LAW

The parties are in agreement on the law in question; the parties are in disagreement on what the law means in the context of this litigation.

**11 U.S.C. § 541(c)(1) provides:**

Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—

(A) that restricts or conditions transfer of such interest by the debtor; or

(B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

**11 U.S.C. § 363(*l* ) provides:**

Subject to the provision of section 365 [concerning executory contracts and unexpired leases], the trustee may use, sell, or lease property under subsection (b) or (c) of this section, or a plan under chapter 11, 12, or 13 of this title may provide for the use, sale, or lease of property, notwithstanding any provision in a contract, a lease, or applicable law that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title concerning the debtor, or on the appointment of or the taking possession by a trustee in a case under this

title or a custodian, and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property.

**Section 2 of the Negotiated Rates Act of 1993** provides in relevant part:

(a) IN GENERAL.—Section 10701 of title 49, United States Code, is amended by adding at the end the following:

"(f) PROCEDURES FOR RESOLVING CLAIMS INVOLVING UNFILED, NEGOTIATED TRANSPORTATION RATES.—

"(1) IN GENERAL.—When a claim is made by a motor carrier of property (other than a household goods carrier) providing transportation subject to the jurisdiction of the Commission under subchapter 11 of chapter 105 of this title, by a freight forwarder (other than a household goods freight forwarder), or by a party representing such a carrier or freight forwarder regarding the collection of rates or charges for such transportation in addition to those originally billed and collected by the carrier or freight forwarder for such transportation, the person against whom the claim is made may elect to satisfy the claim under the provisions of paragraph (2), (3), or (4) of this subsection, upon showing that—

"(A) the carrier or freight forwarder is no longer transporting property or is transporting property for the purpose of avoiding the application of this subsection; \* \* \*

\*　　\*　　\*　　\*　　\*　　\*

"(9) CLAIMS INVOLVING SMALL–BUSINESS CONCERNS, CHARITABLE ORGANIZATIONS, AND RECYCLABLE MATERIALS.—Notwithstanding paragraphs (2), (3), and (4), a person from whom the additional legally applicable and effective tariff rate or charges are sought shall not be liable for the difference between the carrier's applicable and effective tariff rate and the rate originally billed and paid—

"(A) if such person qualifies as a small-business concern under the

Small Business Act (15 U.S.C. 531 et seq.), * * *"

## Section 9 of the Negotiated Rates Act of 1993 provides:

Nothing in this Act (including any amendment made by this Act) shall be construed as limiting or otherwise affecting application of title 11, United States Code, relating to bankruptcy; title 28, United States Code, relating to the jurisdiction of the courts of the United States (including bankruptcy courts); or the Employee Retirement Income Security Act of 1974.

## HISTORY OF THE NEGOTIATED RATES ACT OF 1993

The issue of undercharge claims by trustees of bankrupt motor carriers was nothing new to Congress when it passed the Negotiated Rates Act of 1993. In January of that year, Senator Pressler of South Dakota called for Congress to finish some unfinished business and address the undercharge litigation crisis that had been sweeping the nation for the last five years.

Mr. President, in the early 1980's, common freight carriers began offering legally discounted freight rates to shippers. To avoid revealing these rates to their business rivals, many truckers did not list discounts with the Interstate Commerce Commission. When several big trucking companies went bankrupt, their trustees tried to collect from shippers the monetary difference between the legally discounted rate and the official tariff as filed with the ICC. These monetary differences have become known as an "undercharge."

Today I wish to speak for freight shippers in my home State of South Dakota and across the country. The undercharge crisis is destroying many small businesses and is costing our economy upward of $32 billion. I am here to support relief for shippers from fraudulent negotiated rate claims.

\* \* \* \* \* \*

During the last session of the 102d Congress, the Senate Commerce Committee unanimously reported S. 1675, the Undercharge Equity Act of 1992, which created a procedure for resolving claims against shippers brought by trustees of bankrupt trucking companies attempting to collect undercharges. The Undercharge Equity Act passed the Senate last Congress, but failed to leave the House of Representatives.

Mr. President, I hope that early in this Congress both the Senate and the House will pass the undercharge relief bill. I urge my colleagues to support this legislation as it is designed to alleviate the heavy financial burdens being placed on freight shippers across America.

139 Cong.Rec. S 1522. The focus of Congress was undoubtedly on the trustees of bankrupt carriers. This litigation and the litigation involving the trustee for Transcon Lines in California provided a focus for Congress during their debates. Representative Bud Shuster, cosponsor of H.R. 2121, which eventually became the Negotiated Rates Act of 1993, put the issue in perspective in a prepared statement submitted to the House Subcommittee on Surface Transportation on June 15, 1993:

In all my years in Congress I have not encountered a more inequitable situation as this one, where honest, hard-working companies are being gouged by unscrupulous motor carriers through a simple loophole in the law. I commend the trustees' creativity but condemn their principles of fairness, which are numb to the point of nonexistence. What makes the inequity more abominable is the fact that the party that extorted payments from innocent victims is the same party which violated the law in the first place.

The Negotiated Rates Issue And Proposed Legislative Solutions Thereto: Hearings Before The Subcommittee On Surface Transportation Of The Committee On Public Works And Transportation House Of Representatives, 103d Cong., 1st Sess., p. 2 (1993) (attached as Exhibit E to Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss). The main focus of the hearings before the House subcommittee that day were in reference to claims brought by bankrupt carriers. *See Id.* statement of Representative Jennifer Dunn, p. 22; questions of

Representative Laughlin of Mortimer L. Downey, Deputy Secretary, U.S. Department of Transportation, p. 23; statement of the National Small Shipments Traffic Conference, Inc., p. 99; statement of Gail C. McDonald, Chairman, Interstate Commerce Commission, p. 333.

In deciding to move forward with proposed legislation in the area of undercharge litigation, Congress considered the current need ' for legislative action given the recent history of the motor carrier industry.

## BACKGROUND AND NEEDS

Recent public and media attention has highlighted the trucking "undercharge crisis" affecting shippers in virtually every State of the nation. In one major trucking company bankruptcy case alone, for example, the bankruptcy trustee has initiated more than 30,000 separate collection actions against shippers across the country, seeking as much as $1.5 billion in alleged undercharges. The Committee has received reports that the total amount of undercharges at issue has grown from an estimated $200 million in 1990 to at least several billion dollars today.

## GENESIS OF ISSUE

The Motor Carrier Act of 1980 (1980 MCA) substantially deregulated the interstate trucking industry. The flood of new motor carriers (caused by eased entry) depressed rates for interstate shipments, and many established trucking companies were soon forced to offer steep rate discounts to retain market share. In many cases, however, carriers failed to file tariffs with the ICC to reflect the discounted rates negotiated with shippers. Such rates frequently remained unfiled, despite the fact that the 1980 MCA continued a preexisting requirement under the ICA that motor common carriers file tariff rates with the ICC and that these traffics [sic] would be applicable to all shippers seeking similar transportation movements. (This requirement is known as the "filed tariff doctrine.")

By the late 1980s, many LTL motor carriers had failed, leaving thousands of employees (many of them unionized) out of work. In the wake of these trucking bankruptcies, court-appointed trustees sought to maximize assets available to unsecured creditors, such as unpaid employees and underfunded pension plans. Trustees sued shippers and others, claiming that rates charged for specified shipments years before had undercut the carrier's tariff filed with the ICC, but that the carrier had never filed this lower rate with the ICC as required under the ICA. (Shippers have no legal obligation to file rates with the ICC.) Since the carrier's negotiated rate was unfiled and, therefore, allegedly illegal, trustees argued that the undercharge—the difference between the rate paid and the rate then in the carrier's tariff—was now due. Undercharge claims reflecting this difference, initiated in many cases years after the actual transportation was provided and the negotiated price was paid in full, multiplied quickly. It has been estimated that the amount in dispute concerning unfiled rates (as compared with other theories of undercharge liability) may exceed $1 billion.

The ICC attempted to resolve the undercharge issue in favor of shippers by ruling undercharge collection efforts to be an "unreasonable practice" under the ICA and therefore invalid. Five of six U.S. Circuit Courts of Appeals which reviewed this matter ruled to uphold the ICC's authority, but the Supreme Court (Court) overturned the ICC's position in *Maislin Indus., U.S. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). The Court held, in accordance with the ICA, that a carrier's filed tariff rate is the only legal rate, notwithstanding the equitable defenses of shippers that no other shippers or competing carriers have been harmed by the lower negotiated rate or the carrier's failure to file it. In affirming the filed rate doctrine of the ICA, however, the Court specifically cited Congress' responsibility [to] ameliorate any perceived inequities resulting from this strict application of the ICA with respect to undercharge claims based on unfiled rates.

2

S.Rep. 103–79, 103d Cong., 1st Sess., p. 2–3 (1993) (footnotes omitted) (attached as Exhibit D to Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss Amended Complaint); *see also*, The Negotiated Rates Issue And Proposed Legislative Solutions Thereto: Hearings Before The Subcommittee On Surface Transportation Of The Committee On Public Works And Transportation House Of Representatives, 103d Cong., 1st Sess., p. vii-vii (1993) (attached as Exhibit E to Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss).

Congress wanted to solve the current problem of prolific undercharge litigation by bankrupt carriers and prevent the problem from occurring again in the future. The plan eventually adopted was to eliminate claims against small business shippers and charitable organizations, section 2(a)(9), limit claims based on the difference between negotiated rates and higher filed rates, section 2(a)(1)–(4), establish an "unreasonable practice" defense, section 2(e), resolve the customer account code issue, section 5(a), and clarify the ICC's role in determining disputes between shippers and carriers, *see e.g.*, sections 2(a)(1), (e), & 8. There is no question that the undercharge claims of bankrupt trucking companies were the primary target of this legislation.

It is Plaintiff's contention that Congress missed the mark when section 9 was added to the final bill declaring that the new legislation did not amend the bankruptcy code or affect its application. The legislative history on this section is sparse. The hearings before the House of Representatives on November 15, 1993, on H.R. 2121 indicate that section 9 was added to expressly preserve the jurisdiction of the federal courts, including bankruptcy courts over undercharge actions brought by bankruptcy trustees. Representative Mineta, the bill's sponsor, remarked:

Finally, Mr. Speaker, I would note that we have made a few technical and clarifying amendments to the bill today. Among them, we are clarifying in section 9 of the bill that we do not intend in this legislation to affect either the bankruptcy code or the jurisdiction of the bankruptcy courts, mat-

ters over which our committee does not have jurisdiction. At present, when a carrier is in bankruptcy, and when in the course of the bankruptcy proceeding an issue arises over which the ICC has particular expertise, the court typically refers that issue to the ICC pursuant to the doctrine of primary jurisdiction. The ICC decides that particular issue, and the ICC's decision is then incorporated by the court into the overall adjudication of the bankruptcy case. Nothing in this legislation would alter the current statutory framework which established the respective jurisdictions of the courts and the ICC.

139 Cong.Rec. H9593, H9603 (daily ed. Nov. 15, 1993). Also on the subject of section 9, Representative Brooks, Chairman of the House Committee on the Judiciary, submitted the following comments:

Under current law, the federal courts (and the bankruptcy courts) have broad jurisdiction to make determinations in cases filed under the bankruptcy code. See, for example, 28 U.S.C. 157 and 1334, and Bankruptcy Rule 9019. Moreover, with regard to undercharge claims filed by bankrupt motor carriers, specific recognition has been given to the broad jurisdiction of the courts. *White v. United States*, 989 F.2d 643 (3d Cir.1993). Despite their broad jurisdictional authority, where time permits and pursuant to the doctrine of primary jurisdiction, the federal courts may choose to defer to the expertise of the Interstate Commerce Commission [ICC] with respect to specific issues. *See Reiter v. Cooper* [—— U.S. ——], 113 S.Ct. 1213 [122 L.Ed.2d 604] (1993). Once the ICC has considered the matter, the applicable federal court, may choose to incorporate some or all of the ICC's findings into the overall adjudication of the bankruptcy case.

The current procedure permits the federal courts to assure the timely and fair administration and adjudication of bankruptcy cases. Pursuant to changed language of section 9 of the Act from the language reported from the public works committee, the federal courts including the bankruptcy courts, will continue to have

jurisdiction to make determinations in connection with motor carrier undercharge claims and related issues where the motor carrier has sought the protection of the bankruptcy code. As a result of this provision, in the event of a bankruptcy filing, reference in the Act to resolution by, determination by, and review and approval by the Commission shall be subject to the original jurisdiction of the federal courts pursuant to 28 U.S.C. 157 and 1334.

*Id.*

Plaintiff argues that section 9 was added to prevent the need for a sequential referral of H.R. 2121 to the House Committee on the Judiciary for a determination of the NRA's effect on the bankruptcy code and federal jurisdiction. Whatever the politics that lead to section 9, it is clear from the statute that section 9 was to preserve federal court, including bankruptcy court jurisdiction over undercharge claims brought by trustees of bankrupt motor carriers.

## ANALYSIS

Defendant argues that it is exempt from liability for undercharges because Defendant qualifies for the small business exemption found in section 2(a) of the NRA amending 49 U.S.C. § 10701. Plaintiff argues that section 2 does not apply to the P*I*E estate because of the protection of the bankruptcy code's "anti-forfeiture" provisions found in 11 U.S.C. §§ 541(c)(1) and 363(*l* ).

### A. RULES OF STATUTORY INTERPRETATION.

■ When interpreting a statute, the place to begin is with the statutory language. If the statute is clear on its face, there is no need to look behind the statute to determine the "legislative intent." *U.S. v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 240, 109 S.Ct. 1026, 1029–1030, 103 L.Ed.2d 290 (1989) (recognizing that "as long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute."); *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253–254, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) (emphasizing that the Court has "stated time and again that courts

must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.' " (citations omitted)); *Caro–Galvan v. Curtis Richardson, Inc.,* 993 F.2d 1500, 1505 (11th Cir.1993) (noting that the court's interpretation of a statute "is guided by several factors: the act's purpose as indicated in the legislative history; the plain meaning of the statute's language; [agency] interpretations; and other principles of statutory construction. Our ultimate goal is to give effect to congressional intent." (citations omitted)).

■ Besides arguing that the statute may not be as clear on its face as it appears, Plaintiff argues that section 2 of the NRA conflicts with portions of the bankruptcy code. Plaintiff then goes on to argue that section 9 of the NRA controls the conflict by specifically *not* amending or affecting the applicability of the bankruptcy code. In terms of statutory construction, it is axiomatic that the Court's "obligation [is] to avoid conflicts between two statutory regimes, namely, the [NRA] and [the bankruptcy code], that in some respects [may] overlap. As the Court has said, we 'are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.' We should read federal statutes 'to give effect to each if we can do so while preserving their sense and purpose.' " *Pittsburgh & Lake Erie R. Co. v. R.L.E.A.,* 491 U.S. 490, 510, 109 S.Ct. 2584, 2596, 105 L.Ed.2d 415 (1989) (citations omitted). The Court, therefore, is mindful to avoid a conflict in interpreting the NRA and its relation to the bankruptcy code in this instance.

### B. ON ITS FACE, THE NRA APPLIES TO THE P*I*E ESTATE.

The linchpin of section 2 of the NRA is whether the motor carrier seeking undercharges is "no longer transporting property." It is without question that P*I*E is no longer transporting property. *See* Trustee's Memorandum in Opposition to Defendant's

Motion to Dismiss Amended Complaint, p. 9 ("P*I*E's estate neither transports property for compensation nor conducts any operations.") It is also without question that the provisions of section 2(a) apply to the Plaintiff's undercharge claims. Section 2(c) provides:

APPLICABILITY—The amendments made by subsections (a) and (b) of this section shall apply to all claims pending as of the date of the enactment of this Act and to all claims arising from transportation shipments tendered on or before the last day of the 24–month period beginning on such date of enactment.

All of Plaintiff's claims were pending as of the date of enactment. The question now becomes what effect do the "anti-forfeiture" provisions of the bankruptcy code have on this action.

### C. SECTIONS 541(c)(1) AND 363(*l*) OF THE BANKRUPTCY CODE DO NOT BAR APPLICATION OF SECTION 2 OF THE NRA TO THE P*I*E ESTATE.

#### 1. The Trustee's Causes Of Action Are Property Of The P*I*E Estate.

■ There is no question that the trustee's undercharge causes of action are property of the bankruptcy estate. *See, Maislin Indus. v. Primary Steel,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990); *Gumport v. ICC,* 147 B.R. 770, 774 (Bankr.C.D.Cal. 1992); *In re Bulldog Trucking, Inc.,* 150 B.R. 912, 914 (W.D.N.C.1992); 11 U.S.C. 541(a)(1); 49 U.S.C. §§ 10761 & 11706. The filed rate doctrine has not been eliminated and carriers still may maintain an action for undercharges subject to the limitations contained in the NRA.

#### 2. Scope Of Sections 541(c)(1) and 363(*l*).

The Plaintiff argues that the bankruptcy code nullifies any nonbankruptcy law that affects the property rights of the debtor so long as the nonbankruptcy law is conditioned upon the "insolvency or financial condition of the debtor." In order to understand the interplay, if any, between the NRA and the bankruptcy code, it is important to under-stand the scope of sections 541(c)(1) and 363(*l*).

As noted above, 11 U.S.C. § 541(c)(1) provides in relevant part that "an interest of the debtor in property becomes property of the estate ... notwithstanding any provision in ... applicable nonbankruptcy law ... that is conditioned on the insolvency or financial condition of the debtor, ... and that effects ... a forfeiture, modification, or termination of the debtor's interest in property." Further, 11 U.S.C. § 363(*l*) provides that "the trustee may use, sell, or lease property ... notwithstanding any provision in ... applicable law that is conditioned on the insolvency or financial condition of the debtor, ... and that effects ... a forfeiture, modification, or termination of the debtor's interest in such property." The first question to be answered is what exactly do these provisions provide.

■ It is clear from the language of these sections that *ipso facto* clauses that affect the debtor's property rights solely because of the debtor's insolvency are invalid once the debtor files a petition in bankruptcy. The bankruptcy code sections in question, however, are not without limitation. Section 541(c)(1) "merely defines what interests of the debtor are transferred to the estate. It does not address the threshold questions of the existence and scope of the debtor's interest in a given asset. Under both the [Bankruptcy Act of 1898] and the [1978 Bankruptcy Code], [the Court] resolve[s] these questions by reference to nonbankruptcy law." *In re Farmers Markets,* 792 F.2d 1400, 1402 (9th Cir.1986). Section 541(c)(1) does not nullify nonbankruptcy law affecting a debtor's interest in property but "avoids only those restrictions which prevent transfer of the debtor's property to the estate. Senate Report 95–989 states that '[s]ubsection (c) [of section 541] invalidates restrictions on the transfer of property of the debtor, in order that all of the interests of the debtor in property will become the property of the estate.' S.Rep. No. 95–989, 95th Cong., 2d Sess. 83, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5869." *Id.; see also, In re Polycorp Associates, Inc.,* 47 B.R. 671, 672 (Bankr.N.D.Cal.1985). In other words, sec-

tion 541(c)(1) of the bankruptcy code merely provides that all property of the debtor will become property of the bankruptcy estate and will not be automatically foreclosed before the interests in the property can be properly evaluated in bankruptcy.

■ From the face of the statute, section 363(*l*) is similar, if not more limited than section 541(c)(1). Section 363(*l*) merely protects a trustee's rights in the use or transfer of estate property; it does not begin to define the scope of the estate's interest in that property. Nonbankruptcy law controls that evaluation.

■ The trustee in bankruptcy has the same rights in the property as the debtor, no more and no less. *In re Thomas,* 883 F.2d 991, 995 (11th Cir.1989). "Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). While the bankruptcy code protects the debtor's property rights to the extent that the debtor does not lose any property rights by declaring bankruptcy, the bankruptcy code does not provide the trustee any greater interest in the property than the debtor would have outside the bankruptcy context.

It is without question that the debtor's interest in the causes of action passed from P\*I\*E to the bankruptcy estate as section 541(c)(1) would protect. It is also without question that the trustee is able to "use" those assets by pursuing the causes of action in court as section 363(*l*) would protect. *See also,* 11 U.S.C. § 323; Fed.R.Bankr.P. 6009.

What seems to be lost in the Plaintiff's argument is that the value of Plaintiff's interest in the property must be determined by nonbankruptcy law because bankruptcy law does not create any property rights. Congress created Plaintiff's property interest in the undercharge claims and Congress has the ability to change or eliminate that interest in the future. *See Maislin,* 497 U.S. at 134–137, 110 S.Ct. at 2770–2771. Given the scope of sections 541(c)(1) and 363(*l*), and given that the NRA does not affect the transfer or use of the debtor's property interest in undercharge claims, it would appear the "anti-forfeiture" provisions of the bankruptcy code have no effect on these proceedings whatsoever.

**3. The NRA Is Not Conditioned On "The Insolvency Or Financial Condition" Of The Carrier.**

■ Plaintiff claims that the NRA only applies to certain carriers on the basis of their financial condition and, therefore, the NRA provisions that affect or limit the property rights of the trustee run afoul of the bankruptcy code. The Court is not persuaded.

Section 2 of the NRA limits the remedial provisions contained therein to claims brought by carriers "no longer transporting property." Plaintiff claims that this is another way of saying carriers no longer receiving compensation, or carriers having a financial condition where no income results from carrying property. The Court finds Plaintiff's arguments a stretch, to say the least.[2] Although a company's financial health correlates with the company's operational status, the two are by no means synonymous.

Initially, whether a carrier is in bankruptcy is not determinative of whether section

---

**2.** The Court is aware of Judge Wooten's holding in *In re Bulldog Trucking, Inc.,* 1994 WL 835073, 1994 Bankr. LEXIS 217 (Bankr.W.D.N.C.1994), which was subsequently adopted by the district court in *Cooper v. E.I. DuPont De Nemours & Co.,* 173 B.R. 517 (W.D.N.C.1994). Plaintiff's arguments track Judge Wooten's opinion almost verbatim. This Court, however, is not persuaded by Judge Wooten's analysis of the parallel between "operating condition" and "financial condition." According to Judge Wooten, the term "financial condition" is incredibly broad; so broad that the

term encompasses anything that correlates with an entry on a company's financial statements. This Court finds no support for such an expansive reading of the bankruptcy code, particularly when such a reading would have such a drastic effect on the operation of valid, applicable nonbankruptcy law. As explained more fully below, the Court finds a carrier's operating status quite different and wholly independent of a carrier's "financial condition" as that term is used in 11 U.S.C. §§ 541(c)(1) and 363(*l*).

2(a) of the NRA applies. As a matter of fact, a carrier could be in bankruptcy, continue to transport property, and not be subject to the remedial provisions contained in section 2(a). *See Gross Common Carrier, Inc. v. A.B. Dick Company,* 861 F.Supp. 638 (N.D.Ill. 1993). "The operation of Section 2(a) turns on whether the carrier is still transporting property, whereas the operation of Section 541(c)(1) depends on the financial status of the debtor. These two criteria are not the same." *Jones Truck Lines, Inc. v. Aladdin Synergetics, Inc.,* 174 B.R. 76, 81 (M.D.Tenn. 1994); *see also Jones Truck Lines, Inc. v. Grinnell Corp. Anvil Prods. Div.,* 167 B.R. 488, 493 (N.D.Ill.1994); *Allen v. ITM, Ltd. South,* 167 B.R. 63, 65–67 (M.D.N.C.1994). A carrier that stops transporting property may have a solid "financial condition" whereas one that continues operating in bankruptcy may have a very poor "financial condition." Section 2 would apply to the former and not the latter. So long as a carrier transports property as defined by the Interstate Commerce Act, the provisions of section 2(a) will not apply regardless of the carrier's financial condition. Likewise, if a carrier ceases transporting property, the provisions of section 2(a) will apply regardless of the carrier's financial condition.

Accordingly, this Court determines that 11 U.S.C. §§ 541(c)(1) and 363(*l* ) do not bar the application of section 2(a) of the NRA (49 U.S.C. § 10701(f)) to the estate of P*I*E because section 2(a) is not *conditioned* on P*I*E's "financial condition." The Court further determines that a contrary holding would virtually nullify section 2(a), a holding that would defy logic and defy the plain language of the statute and intent of Congress. *See Gumport v. Sterling Press,* Case No. CV94–1248–IH, slip op. at T23 & T28 (C.D.Cal. March 28, 1994) (attached as Appendix C to Defendant's Memorandum on the Applicability of the Negotiated Rates Act of 1993); *Jones Truck Lines, Inc. v. AFCO Steel, Inc.,* 849 F.Supp. 1296, 1304–05

(E.D.Ark.1994) (attached as Appendix B to Defendant's Memorandum on the Applicability of the Negotiated Rates Act of 1993). As noted above and as conceded by all parties concerned, Congress wanted to solve the problem of trustees in bankruptcy from collecting on billions of dollars in undercharge claims. *See also, Jones Truck Lines, Inc. v. Admiral Marine Company, Inc.,* 858 F.Supp. 71, 72 (E.D.La.1994). Plaintiff would have the Court interpret the NRA as failing to achieve its most basic purpose. All the cannons of statutory interpretation point to only one conclusion in this case and that is that the NRA applies to P*I*E's bankruptcy estate. The only question left to be resolved is whether Defendant has met its burden to be entitled to judgment on its claim that it qualifies for the small business exception under 49 U.S.C. § 10701(f)(9).

## D. DEFENDANT POWER BRAKE IS ENTITLED TO JUDGMENT PURSUANT TO 49 U.S.C. § 10701(f)(9).

Section 2(a) of the NRA provides that no small business, as defined under the Small Business Act, 15 U.S.C. § 631, et seq., shall be liable for undercharge claims. *See* 49 U.S.C. § 10701(f)(9). Defendant claims it is a small business as defined in 13 C.F.R. §§ 121.401 & 121.601. In support of its claim, Defendant submits the affidavit of W.H. Way, President of Power Brake Supply, Inc. Defendant maintains that during 1993, the average number of employees was one (1). Under SIC Code 3714, Transportation Equipment, Motor Vehicle Parts and Accessories, the regulations applicable to Defendant, a business must have less than 750 employees to qualify as a small business. Defendant clearly meets that standard.

In his amended complaint, Plaintiff seeks to collect amounts reflecting the difference between the amounts originally charged and paid and the tariff rates on file with the ICC.[3] It is precisely these claims that section 2 of the NRA was to eradicate. "Quali-

---

**3.** Defendant raises the issue that Count II of the Amended Complaint filed December 20, 1993, violates this Court's order in *Frito–Lay, supra,* prohibiting the Trustee from pursuing claims based on the theory that P*I*E's shipper coded rates are illegal. Because this Court finds the small shipper exception dispositive of this case,

the Court does not reach this issue. Plaintiff has been on ample notice that he may not pursue his "secret shipper code" claims pending review of the *Frito–Lay* decision by the Eleventh Circuit Court of Appeals. The Court expects the Plaintiff to comply with this Court's directives.

fied small businesses which have been billed and have paid for shipping costs are exempt from subsequent claims that the filed tariff exceeded the amount billed. Nothing additional need be shown to take advantage of this exemption." *Adrian Waldera Trucking, Inc. v. Quality Liquid Feeds, Inc.,* 848 F.Supp. 853, 856 (W.D.Wis.1994). Accordingly, Defendant's motion to dismiss will be granted.

Plaintiff has asked the Court to delay entering judgment for the Defendant to enable the Plaintiff to seek discovery on the small shipper exception. Plaintiff, however, provides no evidence that Defendant's employee count of one is so grossly inaccurate that Defendant is actually an employer of more than 750 employees to fall outside the applicable regulations. In essence, this Court is not faced with a question of material fact concerning Defendant's estimation of its number of employees. *See Lewis v. H.E. Wisdom & Sons,* 1994 WL 110659, *4–5, 1994 U.S.Dist.LEXIS 3962, *15–16 (N.D.Ill.1994). Accordingly, Plaintiff's motion for a continuance will be denied.[4]

### CONCLUSION

For the reasons stated herein, it is now **ORDERED AND ADJUDGED:**

1. Plaintiff's Motion for Continuance and Motion for Relief from Stay of Discovery (docket no. 45) is DENIED.

2. Defendant's Motion to Dismiss Amended Complaint (docket nos. 36 & 5) is GRANTED and this cause is hereby DISMISSED WITH PREJUDICE. The clerk is directed to enter judgment in accordance with this order.

**DONE AND ORDERED.**

---

**4.** Plaintiff also seeks relief from a stay of discovery. According to this Court's case management order of February 12, 1993, the general stay of discovery was lifted upon the entry of the order in *Whitaker v. Frito–Lay, supra,* on September 13, 1993. Discovery is not permitted with respect to *shipper code claims* but *other discovery is not* forbidden. The Court, however, will not tolerate discovery for the purpose of harassment or intimidation. The parties are further put on notice that all discovery must be consistent with this Court's orders in *Frito–Lay, Whitaker v. Capital Core,* Case Nos. 91–1074–Civ–J–16 & 93–2–MV–J–16, 1994 WL 243463, (M.D.Fla.1994) and this opinion.